STATE OF CONNECTICUT *v.* GARY J. MCKNIGHT
(9838)

PETERS, HEALEY, PARSKEY, SHEA and GRILLO, Js.

Argued October 11—decision released December 13, 1983

*Joette Katz,* assistant public defender, with whom, on the brief, were *Jerrold H. Barnett,* public defender, and *James J. Ruane,* assistant public defender, for the appellant (defendant).

*Edward J. Caldwell,* assistant state's attorney, with whom, on the brief, were *Donald A. Browne,* state's attorney, and *Richard F. Jacobson,* assistant state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. The defendant was convicted after a trial to a jury of five counts of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4). On this appeal he claims that the trial court erred: (1) in refusing to suppress the out-of-court and in-court identifications; (2) in refusing the defendant's request for a two-day continuance to locate an absent witness; (3) in refusing to reopen the case after it had been submitted to the jury when that witness became available; (4) in instructing the jury regarding the identification and alibi evidence adduced at trial; and (5) in permitting the state to amend its information during trial. Because of the threshold issue of whether the trial court, *Cioffi, J.,* erred in permitting the identification evidence in this case to be presented to the jury, we will first set out the pertinent evidence presented at the pretrial suppression hearing.

## THE PRETRIAL HEARING

Philomena Klesper, supervisor of accounts for Town Fair Tire Center in Stratford, testified as follows: On February 2, 1979, at approximately 3:15 p.m., she was informed by a co-worker, Beverly Figlar, that two black males had approached her office receptionist, asked her a question, and left upon being told that the store was at the other end of the building. She then told Figlar to lock the outer office door but before Figlar could do so, the two men reappeared in the office. She then

heard a voice announce, "[t]his is a hold-up." Klesper looked up and saw a young black male standing before her wearing a blue knit cap and a turtleneck sweater which was partly pulled up to cover his mouth. This man, who was armed with a gun, ordered Klesper and the four other women who worked in the outer office to stand against the wall inside Klesper's office with their hands above their heads. The gunman noticed her efforts to hide her wedding band and he removed it from her. The women were told to lie on the floor. The defendant came into the room she was in, which was well lit. Klesper got a "good look at him [for] a few seconds." The man was very neat looking, about six foot three to six foot five inches tall and wore a black leather coat and cap. She described her emotional state as one of anger and not fear during the incident.

Klesper also testified that the following week a Stratford police detective brought in an array of photographs for the women to examine. She stated that with Figlar standing next to her they were asked if they could identify any of the men presented in the array. They were also informed that the police had other photographs but the police said nothing else at this point. Klesper then testified that Figlar and she pointed to one photograph and were "almost certain" that it was the defendant. They were then told that the police would return with a more recent photograph. The police submitted to them a second array, in which both of them identified the defendant. Klesper stated that at each of the two viewings it only took them a "few seconds" to pick out the defendant's photograph. She noted that the defendant's eyes "just stood out." She also stated that Figlar and she did not speak during this process.

Beverly Figlar, a bookkeeper at Town Fair Tires, also testified. Her testimony with regard to the events during the robbery was consistent with the testimony of

Klesper. She also described the two perpetrators. She described one as a black male wearing a turtleneck sweater pulled up to cover his nose and carrying a silver gun. She stated that the other was taller, about six feet in height, wearing a dark leather coat and a dark knit hat. Figlar testified that after she left work on the day of the robbery she viewed approximately three hundred mug shots at the Stratford police department but could not identify any of them. Subsequently, however, she viewed an array while at work with Klesper. She stated that photographs were set before Klesper and her and that she thought that one of the men looked like the defendant. When shown the photograph of the defendant that had been presented to her in this array, she did not recall having seen that photograph in the array.

The police returned the next day with a more recent photograph and placed this in an array before Klesper and her. Figlar then testified that one of the photographs looked just like the defendant. She stated that she was certain of her identification on this second array and she also identified the defendant in court. Figlar stated that she had viewed the defendant for approximately two minutes during the robbery. Like Klesper, she noted that "the eyes, and everything were his," and that the office was "very bright."

Detective Robert Hultgren, a member of the Stratford police department, testified that he investigated the robbery at Town Fair. He stated that he took a description of the robbers from the women at the Town Fair office. He then had the women view an array of at least eight mug shots, some of which had been gathered from other police departments, which he brought to Town Fair on February 7, 1979. Hultgren stated that because the photographs had been taken from various police departments, they were of different size and color intensity. He testified that Klesper and

Figlar picked out the defendant's picture from this array but that they were not positive that he was one of the perpetrators. Hultgren returned the following day with a second array comprised of eight to ten more recent photographs from the Bridgeport police department, which produced a positive identification from both Klesper and Figlar. He stated that Klesper and Figlar were separated when they viewed this array and that there was no conversation between them. Hultgren testified that other than the defendant's picture, no record was kept as to the first array of pictures shown to the women at Town Fair and, therefore, that array could not be reproduced.[1]

The defendant also testified at the hearing. He stated that on the date of the robbery he was six feet tall and weighed about 152 pounds. The court then ruled that only Figlar's out-of-court identification as to the first array would be suppressed but that her identification as to the second array would not. Neither of Klesper's identifications was suppressed.

### THE TRIAL

At the trial, Klesper testified before the jury about the events of February 2, 1979. She described the robbers and the two out-of-court photographic identifications of the defendant.[2] This testimony was consistent with her pretrial hearing testimony. She then identified the defendant in court.

Figlar also testified at trial as to the events of February 2, 1979, as well as the circumstances surrounding her out-of-court photographic identification

---

[1] The second array of photographs which resulted in a positive identification by both Klesper and Figlar was preserved and introduced at the suppression hearing.

[2] Klesper also testified that later in the day of the robbery she had viewed "hundreds" of mug shots at the Stratford police station without recognizing any of them.

of the defendant. Her testimony in this regard was consistent with that elicited at the pretrial hearing.[3] She then identified the defendant in court.

Hultgren's testimony at trial was also consistent with his version of the facts surrounding the out-of-court identification by Klesper and Figlar. In contradiction of the testimony of Klesper and Figlar, he reiterated that the women were separated when they viewed the photographic arrays. Detective John Horan, who investigated the Town Fair robbery with Hultgren, also testified as to the out-of-court identification made by Klesper and Figlar and stated that each of the two women viewed the arrays separately.

On this appeal, the defendant claims that the identification procedures summarized above violated the defendant's due process rights as they were impermissibly suggestive and unreliable, and that the trial judge erred in denying his motion to suppress the out-of-court and in-court identifications by Klesper and Figlar.[4] We do not agree.

Our recent cases make it quite clear that "the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the 'totality of the circumstances.' " *State* v. *Doolittle,* 189 Conn. 183, 190, 455 A.2d 843 (1983), quoting *State* v. *Theriault,* 182

---

[3] At trial, the prosecutor showed Figlar the defendant's photograph from the first array which had been presented to her at Town Fair five days after the robbery. Consistent with her pretrial hearing testimony, she stated that she did not recall having seen that photograph before.

[4] As stated earlier, the trial judge did suppress the evidence concerning Figlar's out-of-court identification of the defendant relating to the first photographic array she viewed at Town Fair.

Conn. 366, 371–72, 438 A.2d 432 (1980). Further, we have stated that a conviction based upon an in-court eyewitness identification following a pretrial photographic identification will be set aside " ' "if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons* v. *United States,* 390 U.S. 377, 384, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968).' *State* v. *Anderson,* 178 Conn. 287, 291, 422 A.2d 323 (1979)." *State* v. *Doolittle,* supra. Moreover, we have held that on a motion to suppress evidence based upon photographic identifications, the defendant as the moving party must bear the initial burden of proving that the photographic identification was unconstitutional in some manner. *State* v. *Kinsey,* 173 Conn. 344, 346, 377 A.2d 1095 (1977); *State* v. *Hafner,* 168 Conn. 230, 235, 362 A.2d 925, cert. denied, 423 U.S. 851, 96 S. Ct. 95, 46 L. Ed. 2d 74 (1975).

With regard to the photographic identifications in this case, the defendant argues that the manner in which the first array of photographs was shown to Klesper and Figlar on February 7, 1979, was impermissibly suggestive in nature, and further, that the infirmities of that array infected the second array held one day later.[5] He asserts that the difference in size and color intensity of the photographs presented in the first array, the presence of the defendant's picture in the two

---

[5] The defendant has asserted that he cannot carry his burden on this issue because of the action of the Stratford police in not preserving the first photographic array except for the defendant's picture. In this regard, the defendant has made only a bare assertion. Nonetheless, we note that just recently in *State* v. *Doolittle,* 189 Conn. 183, 190, 445 A.2d 843 (1983), we addressed this issue. In so doing, we reaffirmed our position that " '[a]lthough the practice [of retention and preservation for examination at trial of the photographs at pretrial identification] is highly desirable, it cannot be held, as a matter of law, to be a necessary condition precedent to a permissible in-court identification.' *State* v. *Lally,* 167 Conn. 601, 607, 356 A.2d 897,

arrays viewed one day apart, as well as the contradictory testimony regarding whether Klesper and Figlar were separated when viewing the photographs, indicate impermissible suggestiveness.

First, with regard to the difference in size and color intensity of the photographs presented in the first array, such differences in and of themselves do not render an array of photographs unnecessarily suggestive. *State* v. *Davis,* 175 Conn. 250, 254, 397 A.2d 1347 (1978); see *State* v. *Hafner,* supra, 238. Importantly, in the present case, the testimony of the witnesses reveals no firm evidence that the photograph of the defendant identified by the witnesses when they viewed the first array portrayed the defendant as "one giant among a group of Lilliputians. . . ."[6] *State* v. *Maturo,* 188 Conn. 591, 596, 452 A.2d 642 (1982); see, e.g., *State* v. *Gold,* 180 Conn. 619, 655, 431 A.2d 501 (1980) (photograph found unnecessarily suggestive where a mustache had been drawn on it). Second, with regard to the manner in which the arrays of photographs were shown to Klesper and Figlar, we cannot find, on the circumstances of this case, that this was done in an impermissibly suggestive manner. The issue on this point is one of credibility since conflicting testimony was presented as to whether the witnesses viewed the photographic arrays together or separately. Such an

---

cert. denied, 423 U.S. 829, 96 S. Ct. 48, 46 L. Ed. 2d 46 (1975)." *State* v. *Doolittle,* supra, 199. See *People* v. *Adams,* 92 Mich. App. 619, 625, 285 N.W.2d 392 (1979), citing *United States* v. *Clemons,* 445 F.2d 711, 714 (D.C. Cir.), cert. denied, 404 U.S. 956, 92 S. Ct. 322, 30 L. Ed. 2d 273 (1971). That principle is of equal force in this case.

[6] In his brief, the defendant points out that when testifying as to her viewing of the first array, Figlar was shown the defendant's photograph which was included therein and could not recall seeing that picture before although she stated that she believed the photograph she identified was larger. We note, however, that Figlar's testimony in this regard reveals her belief that other photographs in that first array were larger than the one presented at the pretrial hearing.

issue is for the trier of fact to determine; *State* v. *Gold,* supra, 647; and short of a substantial likelihood of misidentification this matter was "customary grist for the jury mill." *Manson* v. *Brathwaite,* 432 U.S. 98, 116, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977).

With regard to the fact that the defendant's photograph appeared in both photographic arrays shown one day apart, we have recognized that pictorial recurrence can be suggestive in that it increases the risk of misidentification. *State* v. *Ledbetter,* 185 Conn. 607, 613, 441 A.2d 595 (1981). With the evidence of suggestibility, we go on and examine this case in light of the second prong of our inquiry, i.e., whether under the totality of the circumstances, the pretrial identifications were nonetheless reliable. "This is so because reliability is the linchpin in determining the admissibility of identification evidence." *State* v. *Doolittle,* supra, 192.

We recognize that the standard is " 'that of fairness as required by the Due Process Clause of the Fourteenth Amendment.' . . . ' "[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil* v. *Biggers,* [409 U.S. 188, 199–200, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972)]; *State* v. *Williams,* 173 Conn. 545, 551, 378 A.2d 588 (1977). "Against these factors is to be weighed the corrupting effect of the suggestive identification itself." *Manson* v. *Brathwaite,* [432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977)]; *State* v. *Williams,* [173 Conn. 545, 551, 378 A.2d 588 (1977)].' *State* v. *Ledbetter* [185 Conn. 607, 614, 441 A.2d 595 (1981)]." *State* v. *Doolittle,* supra, 192–93.

The circumstances in this case indicate quite clearly that the identifications in this case were reliable. Both witnesses had a sufficient opportunity to view the defendant. Although she only viewed the defendant for a few seconds, Klesper stated that the defendant was only about six feet away from her when she got a "good look at him."[7] Figlar viewed the defendant on two occasions of approximately two minutes and one minute in duration, and at one point from a distance of about five feet. Both women testified that the room was very well lit.[8] Their degree of attention under the circumstances was also adequate. Both women gave fairly detailed descriptions of the defendant, although they disagreed as to his height and weight[9] and the material of the cap he wore. Both women, however, in identifying the defendant referred to his eyes as an important identifying characteristic, and both exhibited a high level of certainty upon viewing the recent photograph of the defendant. Although there was a degree of uncertainty during the first photographic array, both Klesper and Figlar identified the defendant's photograph within a matter of seconds in viewing both arrays. Finally, we do not consider the length of time between the crime and the photographic identification in this case to militate against reliability. Both Klesper and Figlar identified the defendant's photograph with certainty in the second array, which was shown six days after the robbery, and with somewhat less certainty five days after the robbery pursuant to the first array. See, e.g., *State v. Ledbetter,* supra, 611–16 (initial photographic iden-

---

[7] We have stated in the past that "a good hard look will pass muster even if it occurs during a fleeting glance." *State v. Ledbetter,* 185 Conn. 607, 615, 441 A.2d 595 (1981), citing *Coleman v. Alabama,* 399 U.S. 1, 4–6, 90 S. Ct. 1999, 26 L. Ed. 2d 387 (1970).

[8] Klesper testified that it was a bright sunny day and that the office had overhead lighting.

[9] Arguably, this may be accounted for because Klesper viewed the defendant from a prone position.

tification occurring six days after crime was committed); *Jennings* v. *United States,* 431 A.2d 552, 559 (D.C. Ct. App. 1981), cert. denied, 457 U.S. 1135, 102 S. Ct. 2964, 73 L. Ed. 2d 1353 (1982) (initial photographic identification occurring seven weeks after crime was committed). We, therefore, cannot find that the trial court erred in concluding that the identifications in this case should not be suppressed.

We next turn to the defendant's claims that the trial judge erred in not granting his request for "two days [continuance] to be able to locate [the witness, Mrs. Kennebrew]," and in denying his request to have the case reopened for the submission of further evidence even though the jury had begun deliberating. The facts pertinent to this issue are as follows: The trial in this case began on Thursday, July 5, 1979, after the pretrial suppression hearing held on that same day. The state presented evidence on Friday, July 6, 1979, and on Monday, July 9, 1979. It rested its case-in-chief on the latter date. The defendant then testified on his own behalf, followed by alibi testimony from Charles Snipes, Jr., during Monday afternoon. Just prior to adjournment on that day, defense counsel informed the court of another witness whom he wished to call but who, apparently, had traveled to Georgia and had not yet returned.[10] The court continued the case until the next morning, Tuesday, July 10, and informed defense counsel that if the witness was not available at that time, he could make an offer of proof.

On Tuesday morning, defense counsel orally moved for a two-day continuance because the witness was still missing. Actually, the transcript discloses that he asked the court for "two days to be able to locate her." The

[10] In addressing the court at this time, defense counsel indicated that he had made the court "aware of" this missing witness during the previous week.

state objected. Thereafter, Robert Beecher, an investigator with the office of the public defender, testified concerning defense counsel's efforts in locating the absent witness. Beecher testified that on June 6, 1979, he had served subpoenas that were valid for thirty days upon the missing witness,[11] Mrs. Beatrice Kennebrew, and her son Jeffrey. He stated that he had told them that she "probably would be a witness" in this trial which was scheduled to start in the middle of June. He further testified that upon inquiry with Kennebrew's neighbors, he learned that she had not yet returned from a trip to Georgia but that she was supposed to have returned the previous weekend.[12] The court then continued the case until the next morning, Wednesday, July 11, but indicated that it might continue the case further stating: "I want you [defense counsel] to make every reasonable effort . . . definitive efforts, and inform me as to the whereabouts of [sic] the availability of this particular witness, if you need to make a request for further extension tomorrow."

The next day defense counsel reported to the court that his attempts to contact Kennebrew had been unsuccessful and admitted that he had "no assurance as to the possibility of her return . . ." within a short time. Defense counsel's motion for further continuance was then denied and the defendant continued to present his case with testimony from Detective James Gallick and Detective Thornton of the Stratford police department. The arguments to the jury followed and the court then adjourned until Thursday morning, July 12, 1979, at which time the court charged the jury and it began its deliberations. Thereafter, defense counsel informed the court that he had been informed

---

[11] The subpoenas were no longer in effect at the time of trial and no new subpoenas had been issued after June 6, 1979.

[12] The defendant presented no further evidence concerning the return of Mrs. Kennebrew.

that Kennebrew "is now back in the jurisdiction, and I can have her here within a short time . . ." and requested that she be allowed to testify before the jury. The state objected. The court denied this request "[b]ased upon all the circumstances, specifically since the charge has been given to the jury, [and] they have now commenced deliberations. . . ." Later that morning, the court, in answering a jury inquiry, ordered certain testimony reread.[13] Thereafter, defense counsel renewed his request to have Kennebrew testify which the court again denied.

The defendant claims that the trial court abused its discretion in denying his request for a two-day continuance and in not reopening the case to permit Kennebrew's testimony. He argues that the court's rulings in this regard infringed on his right to present a defense. First, with regard to the defendant's claim as to the denial of his request for a two-day continuance, we have stated that such matters are "traditionally within the sound discretion of the trial judge." *State* v. *Olds,* 171 Conn. 395, 402, 370 A.2d 969 (1976). It is "not every denial of a request for more time that violates due process." *State* v. *Bethea,* 167 Conn. 80, 84, 355 A.2d 6 (1974). " 'There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.' " Id., quoting *Ungar* v. *Sarafite,* 376 U.S. 575, 589, 84 S. Ct. 841, 11 L. Ed. 2d 921 (1964). The trial judge's discretion, which is a legal discretion, should be " 'exercised in conformity

---

[13] The jury requested the testimony of Klesper, Figlar, Snipes, and the defendant. After being instructed that printed testimony would not be available to it, the jury requested and was permitted to have the testimony of Klesper and Snipes reread. At that time the jury also requested a piece of chalk.

with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice.' " *State* v. *Battle,* 170 Conn. 469, 476, 365 A.2d 1100 (1976), quoting *Hammerberg* v. *Leinert,* 132 Conn. 596, 604–605, 46 A.2d 420 (1946). Moreover, we "must make every reasonable presumption in favor of the proper exercise of the trial court's discretion." *State* v. *Jeustiniano,* 172 Conn. 275, 285, 374 A.2d 209 (1977).

The defendant requested and was granted a continuance on Monday, July 9, 1979. On the next day, Tuesday, he then requested a two-day continuance in order to locate that same witness, with the court hearing testimony as to the efforts made in that regard. The court granted a one-day continuance, but it indicated a willingness to grant a further continuance. It was only on Wednesday, when defense counsel related his unsuccessful further attempts to contact the witness and admitted that he could not give any indication as to when this witness would be available, that the court refused to grant a further continuance. Thus, in view of the circumstances in this case, we do not believe that the trial judge engaged in the "myopic insistence upon expeditiousness in the face of a justifiable request for delay" that we have cautioned against; *State* v. *Jeustiniano,* supra, 285; *State* v. *Bethea,* supra, 84, quoting *Ungar* v. *Sarafite,* supra; and we therefore find no abuse of discretion in his denial of the two-day continuance.

Likewise, we find that the trial court did not err in refusing to reopen the case after the jury had started its deliberations. The general rule is that once the case has been submitted to the jury for its deliberations, the trial judge may, in the exercise of his discretion, reopen the case to permit new evidence to be submitted to the jury. See 4 Wharton, Criminal Procedure (Torcia 12th

Ed. 1976) § 554; Wigmore, Evidence (Chadbourn Rev. 1976) § 1880; annot., 87 A.L.R.2d 849 (1963); see generally *State* v. *Holmquist,* 173 Conn. 140, 152, 376 A.2d 1111, cert. denied, 434 U.S. 906, 98 S. Ct. 306, 54 L. Ed. 2d 193 (1977); *State* v. *Chapman,* 103 Conn. 453, 479, 130 A. 899 (1925). In making this claim, the defendant asserts that he was denied due process.[14] We do not agree.

In examining the case before us, we consider the principle stated in *People* v. *Olsen,* 34 N.Y.2d 349, 313 N.E.2d 782, 357 N.Y.S.2d 487 (1974): "There are obvious reasons why at this stage the power to reopen a case for additional proof must be exercised with utmost caution. One reason of course is that at some point the trial must come to an end (cf. *Mary* v. *State,* 5 Mo. 71 [1837]). If requests to reopen were casually granted and became routine, the orderly trial process, fundamental to our jurisprudence, would soon erode away. Another consideration, apart from the merits of a predictable trial pattern, is that new evidence introduced during the jury's deliberations is likely to be given 'undue emphasis . . . with consequent distortion of the evidence as a whole' giving rise to the real possibility of prejudice to the party against whom the evidence is offered (*Eason* v. *United States,* 281 F.2d 818, 822 [9th Cir. 1960]). On the other hand, a procrustean rule arbitrarily cutting off all possibility of submitting any evidence after the jury has retired, would be difficult to reconcile with the concept of the trial as a truth-

---

[14] In its brief the state points to the language of Practice Book § 856 which provides in relevant part that "[a]fter the case has been submitted to the jury, no pleas, arguments or evidence shall be received before the verdict is returned . . . ." It seems to argue that "[a]rguably the inclination of the trial court not to reopen the case . . . was not even a matter within its discretion since . . . [this rule] by its terms would prohibit . . ." the reception of any evidence at that time. This is the first time in this case that § 856 was referred to on this issue. In fact, at trial, the defendant, in arguing for reopening, urged the court to exercise its discretion and do

finding process. Thus . . . the prevailing view permits the trial court some discretionary power to reopen during the jury's deliberations, particularly where an essential element has been overlooked or evidence newly discovered bears directly on the question of the defendant's guilt or innocence . . . ." *People* v. *Olsen,* supra, 353–54; see *United States* v. *Burger,* 419 F.2d 1293, 1295 (5th Cir. 1969); *Henry* v. *United States,* 204 F.2d 817, 820–21 (6th Cir. 1953); *State* v. *Roberts,* 247 Ga. 456, 457–58, 277 S.E.2d 644 (1981). In *Olsen,* the Court of Appeals pointed out that the power to reopen at the deliberating stage must be exercised "with utmost caution" and that such evidence may receive "undue emphasis." *People* v. *Olsen,* supra, 353, 354; see *Embrey* v. *Holley,* 48 Md. App. 571, 602, 429 A.2d 251 (1981), aff'd in part, rev'd in part, 293 Md. 128, 442 A.2d 966 (1982). Realistically, claims of surprise by the other side can generate a request to rebut, threatening a resumption of the trial. *People* v. *Olsen,* supra, 354.

"Due process guarantees that a criminal defendant will be treated with 'that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial.' *Lisenba* v. *California,* 314 U.S. 219, 236, 62 S.

---

so. As authority for that claim, the defendant cited *State* v. *Chapman,* 103 Conn. 453, 479, 130 A. 899 (1925). At that time, neither the court, the state, nor the defendant mentioned § 856. We find nothing in the record to demonstrate that the trial court premised its denial on anything but its discretion. Because the motion was made, argued and decided on that basis in the trial court, we will consider this claim of error on the same basis. See *Machiz* v. *Homer Harman, Inc.,* 146 Conn. 523, 525, 152 A.2d 629 (1959); *Jenkins* v. *Bishop Apartments, Inc.,* 144 Conn. 389, 391, 132 A.2d 573 (1957); *Alexander* v. *Alexander,* 107 Conn. 101, 106, 139 A.2d 685 (1927); Maltbie, Conn. App. Proc. § 42. Moreover, the interests of justice indicate this approach.

Ct. 280, 290, 86 L. Ed. 166 (1941)." *United States* v. *Valenzuela-Bernal,* 458 U.S. 858, 102 S. Ct. 3440, 73 L. Ed. 2d 1193 (1982); see *State* v. *Griffin,* 175 Conn. 155, 160, 397 A.2d 89 (1978). In state criminal prosecutions, due process "secures the accused in those certain basic and fundamental rights which are an integral part of the American system of criminal jurisprudence." *Application of Stecker,* 271 F. Sup. 406, 409 (D.N.J. 1966), aff'd, 381 F.2d 379 (3d Cir.), cert. denied, 389 U.S. 929, 88 S. Ct. 290, 19 L. Ed. 2d 280 (1967). The sixth amendment has been said to include "a compact statement of the rights necessary to a full defense" which is part of the fourteenth amendment guarantee of due process of law. *Faretta* v. *California,* 422 U.S. 806, 818, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975). One of these rights is "to offer testimony . . ."; see *Washington* v. *Texas,* 388 U.S. 14, 18, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967); "through the calling and interrogation of favorable witnesses . . . ." *Faretta* v. *California,* supra. The sixth amendment "constitutionalizes the right . . . to make a defense as we know it." *Faretta* v. *California,* supra. The First Circuit recently said: "For a court's refusal to reopen and receive new evidence after the parties have rested to constitute a sixth amendment violation we think greater prejudice must be shown than in refusals to receive evidence offered in the regular course of a trial. . . . [A] trial judge must be allowed a fair degree of discretion in ruling upon motions to reopen the defense. And for his adverse ruling to violate the sixth amendment, it must be shown that the proffered evidence was of such importance to the achievement of a just result that the need for admitting it overrides the presumption favoring enforcement of the state's usual trial procedures. . . ." *Blaikie* v. *Callahan,* 691 F.2d 64, 67–68 (1st Cir. 1982).

In applying the foregoing principles here, we cannot conclude that the defendant's due process rights were violated. In the absence of an offer of proof, presumably, the testimony of Kennebrew would have been in the nature of an alibi in view of the fact that the defendant and Snipes, an alibi witness for the defendant, testified that Kennebrew was also with Snipes and the defendant at the time that the robbery was committed. Thus, presumably, Kennebrew's testimony concerning an alibi would have had the potential effect of bolstering the credibility of the defendant and Snipes. While the constitution, and more specifically the sixth amendment, protects the basic right of a criminal defendant to call witnesses on his own behalf; *Washington* v. *Texas,* supra; that protection is not unlimited. *United States* v. *Nobles,* 422 U.S. 225, 241, 95 S. Ct. 2160, 45 L. Ed. 2d 141 (1975); *Blaikie* v. *Callahan,* supra, 66–67. In the circumstances of this case, considering the state's interest in an orderly trial process as well as the potential for the jurors to place undo emphasis on such evidence if admitted, the nature of such evidence, and the fact that Kennebrew was not even in court when the motion was made, the court did not violate the defendant's due process rights in its denial of his motion to reopen the case after it was submitted to the jury.[15]

We next turn to the defendant's claim that the trial court erred in instructing the jury with regard to the identification and the alibi evidence adduced at trial. With regard to the instruction on the identification

---

[15] We note additionally that our statutes do provide an opportunity for the defendant to move for a new trial when, inter alia, evidence is newly discovered or for other reasonable cause. General Statutes § 52-270. Such a motion had been made in this case, but it did not include any reference to the effect that the testimony of Kennebrew would have had in the case. At oral argument, the defendant's counsel conceded that Kennebrew never testified concerning what she would have testified to had the case been reopened for her testimony.

testimony given at trial, the defendant claims that the trial court erred in not accepting his requested "model" charge based upon the charge promulgated in *United States* v. *Telfaire,* 469 F.2d 552, 558–59 (D.C. Cir. 1972). Specifically, he claims that the jury charge in this case failed to remind the jury that an identification must be the product of the witness' own recollection, and further, that if identification may have been influenced by the identification process, then the identification should be scrutinized with great care.[16] With regard to the jury instruction regarding the alibi evidence, the defendant claims that the trial court failed to delineate adequately the relationship between the alibi evidence and the finding of guilt upon the reasonable doubt standard. Specifically, he claims that the defendant was entitled to an instruction that if, upon the consideration of all of the evidence, the jury had a reasonable doubt as to the defendant's presence at the scene of the crimes, it had a duty to acquit the defendant even if it was not satisfied from the alibi evidence that he did not commit the crimes.

Initially, we observe that the same fundamental principles apply in examining both of the instructions at issue. " 'A charge to the jury will not be critically dissected for the purpose of discovering possible inaccuracies of statements, but the charge is to be considered, rather, as to its probable effect upon the jury in guiding them to a correct verdict in the case.' " *State* v. *Miller,* 186 Conn. 654, 661, 443 A.2d 906 (1982). Jury instructions are not to be viewed in a vacuum, and to achieve justice the charge must be clear, accurate, complete and comprehensible. *State* v. *Roque,* 190 Conn.

---

[16] The charge requested by the defendant emphasized four basic considerations: (1) the capacity and opportunity of the witnesses to observe the offender; (2) whether the identification made by the witnesses was from their own recollection; (3) the failure or inconsistency of the identification; and (4) the credibility of the witnesses.

143, 157, 460 A.2d 26 (1983); *State* v. *Kurvin,* 186 Conn. 555, 558, 442 A.2d 1327 (1982). "The ultimate test of a court's instructions is whether, taken as a whole, they fairly and adequately present the case to a jury in such a way that injustice is not done to either party under the established rules of law." *State* v. *Harden,* 175 Conn. 315, 322, 398 A.2d 1169 (1978).

Applying the foregoing principles first to the defendant's claim regarding the charge on the identification evidence, we find his position untenable. We have in the past addressed the issue of a detailed or "model" charge concerning the dangers of misidentification. See, e.g., *State* v. *Harden,* supra, 321; see also *United States* v. *Fernandez,* 456 F.2d 638, 643–44 (2d Cir. 1972). A careful examination of the charge in this case reveals, however, that although the defendant's charge was not adopted verbatim, the salient principles of the court's charge adequately covered the dangers of misidentification. The court charged the jury that it should "consider whether or not the witnesses have the *capacity and adequate opportunity* to observe the participant of this crime . . . ." The court stated that the jury "should consider *the length of time these witnesses had to view the participant.* The lighting conditions. The distance between the witnesses and the perpetrator[s] of the crime." The court also instructed the jury to consider "the *length of time between the incident and the identification* and *the circumstances under which the identifications were made"* as well as "[t]he description of the perpetrator given to the police by these particular witnesses prior to the identification and the witnesses' positiveness in the identification or lack thereof. Or, you should also consider if that might be the case that there was no identification in certain cases." (Emphasis added.) Further, these instructions immediately followed the court's instruction as to the jury's

role in making determinations of credibility and that in "assessing identification testimony and what weight to give [the] same, you would of course, *take into account all of the testimony relating to identification.*" (Emphasis added.) In sum, while the court's charge did not follow the specific language of the request, it was correct in law, adapted to the issues and sufficient for the guidance of the jury. *State* v. *Perez,* 183 Conn. 225, 229, 439 A.2d 305 (1981); *State* v. *Sumner,* 178 Conn. 163, 170, 422 A.2d 299 (1979).

Likewise, we find the defendant's claim challenging the alibi charge to be without merit. In *State* v. *Rosado,* 178 Conn. 704, 708 n.2, 425 A.2d 108 (1979), we reaffirmed our position that "[a]lthough an alibi is sometimes spoken of as a defense, it operates, in this state, to entitle an accused to an acquittal when he has so far proved his alibi that upon all the evidence a reasonable doubt of his guilt has been raised. While the state is bound to prove beyond a reasonable doubt all the essential elements of the crime charged, including proof of the presence of the accused at the scene of the crime, where an alibi is asserted and relied upon as a defense, the accused is entitled to have the jury instructed that the evidence offered by him upon that subject is to be considered by them in connection with all the rest, in determining whether he was present, and that if a reasonable doubt upon that point exists, it is their duty to acquit. *State* v. *White,* 155 Conn. 122, 123, 230 A.2d 18 (1967); *State* v. *Brauneis,* 84 Conn. 222, 231, 79 A. 70 (1911)."

Here, the trial court instructed the jury of the state's burden to "prove beyond a reasonable doubt that he [the defendant] was at the location [of the crime] at the time the incident occurred." The court also emphasized that the jury should consider "all the evidence in this case to determine whether or not the defendant was

at the scene of the crime when it was committed." In accordance with the principles that we reaffirmed in *State* v. *Rosado,* supra, we think it quite clear that the court properly instructed the jury as to the legal relationship between the alibi evidence and the state's burden of proof.

Finally, we turn to the defendant's claim that the trial court erred in permitting the state to amend its information during trial. The sequence of events on this issue, stated simply, is as follows: The state filed its first information on March 1, 1979, charging that the defendant robbed the five victims of "current monies of the United States of America, and in the course of the commission of the crime threatened the use of . . . a firearm . . . ." On May 23, 1979, the state filed a substitute information which still did not delineate the specific items taken from the victims, but which stated that "in the course of the commission of the crime *another participant* . . . threatened the use of . . . a firearm . . . ." (Emphasis added.)

The pretrial suppression hearing took place on July 5, 1979, while this second information was in effect, during which time the victims described the property taken from them. The case then proceeded to trial on that same day and the state called as its first witness Mrs. Klesper, one of the victims of the crime, who again delineated her property losses. Defense counsel then moved to strike her testimony in this regard as being at variance with the second information which was at that time in effect. The trial judge reserved his decision on the motion until the "appropriate time," and Klesper continued to testify for the state on direct examination. The following morning the court granted the state permission to amend the information to conform to Klesper's testimony concerning the nature of

the property taken.[17] Klesper was then cross-examined
by the defense. Figlar was then examined and cross-
examined. The state then formally submitted the infor-
mation which comported with the testimony at trial as
to the property taken. This information, however,
returned to the language of the first information stating
that it was the *defendant and not another participant
who "threatened the use of . . . a firearm."* (Emphasis
added.) Finally, on July 10, 1979, after the state had
rested its case and the defense had commenced its case
with the alibi testimony of Snipes, the state again
requested and was granted permission to amend its
information to allege that it was *not the defendant but
another participant who had threatened the use of a
firearm.*

The defendant asserts that this fourth information
should not have been permitted. We do not agree.
He claims that he was prejudiced in that his cross-
examination of the state's witnesses occurred under
the third information, which claimed that it was the
defendant who threatened the use of a firearm. He
argues that the manner of his participation was inti-
mately related to the question of identification and the
amendment in this case therefore implicated his sub-
stantive rights.[18] Moreover, he claims that there was
no express finding of good cause for the amendment
which, he claims, is required by Practice Book § 624.[19]

[17] The trial judge found that such an amendment would create "no sub-
stantial surprise or prejudice in fact." In so doing, he noted that the evidence
in the case, especially the warrant, had familiarized counsel as to the prop-
erty taken.

[18] The defendant's brief does state: "Admittedly no new or different crime
was charged by the amendment at issue here."

[19] Practice Book § 624 provides: "After commencement of the trial for
good cause shown, the judicial authority may permit the prosecuting author-
ity to amend the information or indictment at any time before a verdict
or finding if no additional or different offense is charged and no substan-

We do not see how the sequence of amendments in this case could have altered defense counsel's line of cross-examination of Klesper and Figlar, the two key identification witnesses in this case. As set forth above, the transcript reveals that when both of these witnesses were cross-examined, defense counsel could not have been misled by the allegation of the third information which stated that the defendant threatened the use of a firearm so as to change defense counsel's tactics at trial. When the trial began, the second information which had alleged that another participant threatened the use of a firearm was in effect. Although the state had permission to amend its information prior to the cross-examination of both Klesper and Figlar, the only change that the court had approved and that the defendant could justifiably have relied upon was the change in the information with regard to the property taken from the victims. Thus, the defendant's argument that his substantive rights were prejudiced by the fourth and final information, which only corrected the apparent clerical error made in the third information as to which participant threatened the use of a firearm, is without merit.

Further, even had defense counsel engaged in cross-examination of the state's identification witnesses with the allegation of the third amendment in mind, we would still not find prejudice to the defendant. His main defense at trial was alibi; the thrust of defense counsel's cross-examination of the state's key witnesses related to identification and not whether the defendant threatened the use of a firearm. Thus, the amendment in this case, even under these circumstances, did not affect the defendant's substantive rights. See *State* v. *Wallace,* 181 Conn. 237, 239, 435 A.2d 20 (1980).

tive rights of the defendant would be prejudiced. An amendment may charge an additional or different offense with the express consent of the defendant."

Additionally, although the record below does not have an explicit finding of good cause for the amendment, we note that defense counsel below did not object to the amendment on that ground but only on the ground that the amendment would prejudice the substantive rights of the defendant. Thus, because we believe the existence of good cause is implicit in the facts set forth above, we cannot find that the trial court did not follow Practice Book § 624 in permitting the fourth information to be filed.

There is no error.

In this opinion the other judges concurred.