## STATE OF CONNECTICUT *v.* NORMAN A. THERIAULT

COTTER, C. J., BOGDANSKI, PETERS, HEALEY and PARSKEY, Js.

Argued October 8—decision released November 25, 1980

Bruce A. Sturman, assistant public defender, with whom, on the brief, was Jerrold H. Barnett, public defender, for the appellant (defendant).

C. Robert Satti, state's attorney, with whom, on the brief, was Michael G. Durham, law student intern, for the appellee (state).

ARTHUR H. HEALEY, J. Upon a trial to the jury, under a four count information, the defendant, Norman A. Theriault, was found guilty as charged of the crimes of robbery in the first degree, unlawful restraint in the first degree, burglary in the first degree, and possession of burglary tools in violation of §§ 53a-134(a)(2), 53a-95, 53a-101(a) and 53a-106(a) of the General Statutes, respectively. He took the present appeal from the judgment, pressing as claims of error that the court erred in refusing to suppress identification testimony and that the court's jury instruction either impermissibly shifted the burden of proof to the defendant to disprove his mental state or relieved the state of the necessity of proving the defendant's mental state, in violation of his due process rights.

This case arose out of events that occurred on May 2, 1975; certain background facts are not substantially in dispute. About 4:30 a.m. Trooper Joseph Brooks of the Connecticut State Police came upon a 1968 gold Ford Mustang pulled off to the side of the road near the entrance to the Connecticut Correctional Institution (hereinafter State

Farm) in Niantic. Stopping to investigate, Brooks determined that the Mustang was unoccupied and locked, but that the engine was warm. Because he did not find anyone near the car and it did not appear that the car had been stolen or involved in an accident, Brooks recorded its registration number and proceeded on his normal rounds.

At about that same time two white males wearing stocking masks burst into one of the rooms in the administration building of the State Farm and confronted Anna Monk, the switchboard operator. Her screams alerted Raymond Davis, a guard who was in another room, who ran down the hallway to the room where Monk was located. The taller of the two intruders was armed with a revolver; the other held a wrench. Monk and Davis were ordered to lie face down on the floor where they were tied up and gagged. The process of tying up Monk and Davis took about fifteen minutes. The man with the revolver took Davis' wallet from his pocket and removed $81. The man with the wrench, later identified as the defendant, looked through Monk's pocketbook, but did not take anything. While both Monk and Davis lay on the floor, they heard banging and pounding down the hallway. After a time the man with the revolver left and everything became quiet.

Davis then untied himself, grabbed the long wrench which had been left in the room, and went down the hallway. In the room at the end of the hallway, he observed that the State Farm safe had been turned over on its side and broken into. He also noticed that a window in the room had been knocked out. He called the state police, and then

untied Monk. The police arrived immediately. Monk and Davis informed the police that they had been robbed by two masked males, one of whom had a silver plated revolver and the other a large wrench. While at the State Farm, Monk and Davis also briefly described the two men. After receiving this description, a police dispatcher transmitted this preliminary information which described the intruders as two white males, one over six feet tall, thin with straggly blond hair and the other being five feet seven to five feet eight, with a stocky build and short dark hair.

Meanwhile, a check was made of the registration of the gold Mustang which was observed earlier by Trooper Brooks and which was gone after the robbery took place. That check disclosed that that vehicle belonged to Edward Vesneski, Sr., of Milford. As a result of this information, a police surveillance was set up on I-95 for the vehicle. Soon thereafter, police stopped the described vehicle in New Haven after it had been observed going through the Branford toll on I-95 at about 6 a.m. On approaching the Mustang, a trooper observed a silver plated revolver on the floor between the legs of the front seat passenger. The three occupants of the car, later identified as Norman Theriault, Leonard Vesneski and Edward Vigliotto, were removed from the car, handcuffed and arrested for the robbery at the State Farm and for possession of a weapon in a motor vehicle. A search of the car revealed a ski mask, a hat and a blue duffel bag which contained a small metal strongbox. The prisoners were then taken to the state police barracks at Montville arriving there sometime between 8 a.m. and 8:30 a.m.

Earlier that morning, at about 7 a.m., Monk and Davis had been taken to the Montville barracks to be interviewed. Monk described one of the robbers, later identified as the defendant, as being a white male around twenty years old, with brown hair, about five feet nine inches tall, and about 160 to 165 pounds; both shorter and heavier than the other robber. While Monk was being interviewed by a detective, a trooper came into the room and said that the Bethany troopers had apprehended somebody. When Monk finished making her statement, she went into another room while Davis was interviewed. After both she and Davis had been interviewed, another trooper came into the room where they were sitting and asked Monk to describe the gun used in the robbery. After she did this, she was shown a silver revolver and asked if it looked familiar. Apparently at the same time she was also asked for what purposes a blue duffel bag and manila envelopes were used at the State Farm.

Thereafter, Monk was brought by the detective who interviewed her into a room with a one-way mirror. An armed trooper brought the prisoner Edward Vigliotto, who was handcuffed,[1] into the room on the other side of the one-way mirror. Monk stated she had never seen him before.[2] After Vigliotto was removed, the defendant, who was also handcuffed, was brought into the same room. Monk

[1] There was conflicting testimony as to whether all three defendants were handcuffed at the time of the show-up. Monk testified that all three men were handcuffed at the time she viewed them in the show-up. Detective David Paige, of the Connecticut State Police, who was present at the show-up, testified that he did not recall the three men being handcuffed.

[2] As it later developed, Vigliotto was not one of the two robbers who had confronted her earlier that morning in the office at the State Farm.

identified him as the shorter robber who had held the wrench over her head and as one of the two intruders who had tied her up. After the defendant was removed from the room, Vesneski, also handcuffed, was brought into the room. Monk identified him as the taller robber who was armed with the revolver. The same procedure was repeated for Davis. He identified the defendant and Vesneski as involved in the State Farm incident earlier that morning. He also recognized the third prisoner, Vigliotto, not because he saw him in the perpetration of the crimes earlier that morning, but because Vigliotto had just finished serving a term of incarceration at the State Farm.

Before trial, the trial court held a hearing on the defendant's motion to suppress the out-of-court identifications made of the defendant at the Montville police barracks. The court denied the motion. The evidence at the trial included that elicited during the suppression hearing. Both Monk and Davis testified and made in-court identifications of the defendant.

We turn to the defendant's claim that the court erred in refusing to suppress the identification testimony in that the show-up at the police barracks violated his due process rights because it was impermissibly suggestive and gave rise to a substantial likelihood of irreparable misidentification. In determining whether identification procedures violate a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was never-

theless reliable based on examination of the "totality of the circumstances." See *State* v. *Gold,* 180 Conn. 619, 656–58, 430 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980); *State* v. *Piskorski,* 177 Conn. 677, 741, 419 A.2d 866 (1979); *State* v. *Willin,* 177 Conn. 248, 251, 413 A.2d 829 (1979); *State* v. *Smith,* 165 Conn. 680, 684, 345 A.2d 41 (1974); see also *Manson* v. *Brathwaite,* 432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); *Neil* v. *Biggers,* 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972).

Applying the test thus prescribed, we must first determine whether the identification procedure used by the police at the show-up[3] at the police barracks was unnecessarily suggestive. Although one man confrontations do not per se constitute a denial of due process; *Neil* v. *Biggers,* supra; *Simmons* v. *United States,* 390 U.S. 377, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968); *Stovall* v. *Denno,* 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967); *State* v. *Middleton,* 170 Conn. 601, 606, 368 A.2d 66 (1976); *State* v. *Carnegie,* 158 Conn. 264, 269, 259 A.2d 628, cert. denied, 396 U.S. 992, 90 S. Ct. 488, 24 L. Ed. 2d 455 (1969); this court has stated that "[w]ithout question, almost any one-to-one confrontation between a victim of crime and a person whom the police present to him as a suspect must convey the message that the police have reason to believe him guilty . . . ." *State* v. *Middleton,* supra, 608, quoting with approval *United States ex rel. Kirby* v. *Sturges,* 510 F.2d 397, 403 (7th Cir. 1975); see *State* v. *Willin,* supra, 251. On the basis of the circumstances of this case, the show-up identification pro-

---

[3] See the annotation in 39 A.L.R.3d 791 for an extensive treatment of the admissibility of show-up identification as affected by allegedly suggestive show-up procedures. See also annot., 39 A.L.R.3d 487.

cedure used was unnecessarily suggestive. While Monk was being interviewed, a trooper came into the room and said the Bethany troopers had apprehended somebody. When Monk and Davis were in a room after both had been interviewed, a trooper asked her to describe the gun used in the robbery. She did, he showed her a gun and asked her if it looked familiar. At about the same time Monk was also asked for what purposes a blue duffel bag and manila envelopes were used at the State Farm. She understood this to mean that the goods taken from the State Farm had been recovered. Thereafter, she was taken into the room with the one-way mirror for the show-up and while there identified, inter alia, the defendant who she testified was handcuffed. The show-up procedure also does not appear to have been necessary since exigent circumstances did not exist; cf. *Stovall* v. *Denno,* supra; because the defendant and his associates were safely in custody, the eyewitnesses (Monk and Davis) were readily available, and there is no claim a lineup procedure was impractical. We conclude therefore that the show-up identification procedure in this case was unnecessarily suggestive.

The fact that a pretrial identification is unnecessarily suggestive, however, does not end the inquiry into whether the identification is admissible at the trial. Because reliability is the "linchpin" in determining the admissibility of identification evidence; *Manson* v. *Brathwaite,* supra, 114; *State* v. *Piskorski,* supra, 742; we must consider whether under the "totality of circumstances" the identifications were reliable. "The factors to be considered in determining the reliability of an identification 'include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of atten-

tion, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.' *Manson* v. *Brathwaite,* supra, 114 (citing *Neil* v. *Biggers,* supra, 199–200)." *State* v. *Piskorski,* supra, 742.

Turning to the evidence in this case, we consider it in the light of the factors referred to in determining reliability. There was evidence, according to both of the victims, that the room in which the two robbers confronted and tied up Monk and Davis was well lighted by flourescent lights and a desk lamp. Davis testified that the stocking masks only slightly distorted the defendant's features. Monk testified that even though the defendant wore a stocking mask, she could tell his color and facial features. She also testified that the defendant was, at times, as close as one and one-half feet from her, and that she looked at the defendant for more than ten minutes before she screamed because she thought he was going to hit her with the wrench he had raised over her head. When the defendant put the gag in her mouth, the defendant was close enough to her to smell the perfume she was wearing and to tell her he liked it. Davis said he observed the defendant for fifteen to twenty minutes and was looking at his face most of the time. The distance between the defendant and himself, Davis testified, ranged from two to twelve feet. Davis identified the defendant also because he remembered him as the one holding the wrench, as the one who, while tying Davis up, injured his (Davis') neck, and as the one who tied Monk up. Before the actual show-up both Monk and Davis gave accurate gen-

eral descriptions of the defendant. At the show-up both Monk and Davis were certain that the defendant was one of the men involved in the crime. Although three men were involved in the show-up, Monk and Davis, independent of each other, identified the second and third men (Theriault and Vesneski) as having been involved in this incident. Moreover, Monk said she had never seen Vigliotto before and that he was not one of the two robbers who confronted her. Davis testified, as noted earlier, that he was able to identify Vigliotto, not because he observed him during the perpetration of the crime, but because Vigliotto had just finished a term of incarceration at the State Farm. Finally, the short length of time between the crime and the confrontation contributes to a conclusion of reliability of the identifications: the robbery began about 4:30 a.m., pre-showup statements were made by Monk and Davis to the police around 7 a.m. and the actual show-up occurred between 9:30 a.m. and 10 a.m., which is about five hours after the incident at the State Farm began.

It is clear that the identification evidence was reliable and that the trial court did not err in refusing to suppress the evidence of those identifications. Therefore, the defendant's constitutional rights were not violated as claimed.

The defendant also claims that the court erred in its instructions to the jury on the element of intent necessary to convict him as an accessory to robbery in the first degree. He contends that the instructions on the accessory statute directed a verdict on the element of intent or, at the very least, shifted to him the burden of disproving criminal intent.

Since the evidence at the trial indicated that it was not the defendant, but his taller, armed companion, who took Davis' wallet and money, the court properly gave instructions on the accessory statute, i.e., General Statutes § 53a-8,[4] with respect to the robbery count. After referring to some of the evidence adduced at the trial about the robbery of Davis, the court read from the accessory statute to the jury and defined the elements of that statute. In the process of going through the elements of the accessory statute the court stated to the jury: "Now there is no question here having been raised concerning the defendant's mental state so you can treat him as having the mental state required for the commission of the crime if you find that he is the actual one that did it." At the conclusion of the entire charge, counsel for both the state and the defendant duly excepted to the portions of the instructions on the intent necessary to find the defendant guilty as an accessory.[5]

The defendant contends that the court's instructions on "mental state" are indistinguishable from the charge we held erroneous in *State* v. *Teart*, 170

---

[4] General Statutes § 53a-8 provides: "A person, acting with the mental state required for commission of an offense, who solicits, requests, commands, importunes or intentionally aids another person to engage in conduct which constitutes an offense shall be criminally liable for such conduct and may be prosecuted and punished as if he were the principal offender."

We note that the state filed a request to charge on the matter of an accessory.

[5] The state, referring to the challenged instruction, suggested that the court possibly reexamine its instructions in the light of *State* v. *Teart*, 170 Conn. 332, 365 A.2d 1200 (1976). The defendant, joining in the state's exception, claimed that the term "mental state" as used in the accessory statute, as the court had instructed the jury thereon, violated the defendant's presumption of innocence and "shift[ed] to him the burden of proof with regard to an essential element of the offense."

Conn. 332, 365 A.2d 1200 (1976). The effect of the charge, the defendant claims, could reasonably have resulted in two possibilities. The first is that the jury understood it to mean that the defendant's intent need not be proven, thereby relieving the state of its burden of proof on the defendant's mental state, i.e., his intent. The second is that the jury understood the charge to mean that the defendant had to produce evidence to disprove this "assumption" that he possessed the necessary mental state required. Further, the defendant argues that, even reviewing the instructions as a whole, there is harmful error even in light of the portion claimed by the state to be corrective[6] since this "correcting" instruction increased the potential for confusing the jury on the issue of intent. The state counters by saying that *Teart* is distinguishable from this case; that in the context of the whole charge a reasonable juror could not have understood the charge to mean either that the element of intent need not be proven or that the burden of proof on that element was shifted to the defendant; that the challenged instruction was in fact unnecessary since the defendant was a "co-principal" in the crime; and that even if the charge were erroneous, the error was harmless because the defendant's defense was that of alibi.

In *State* v. *Teart,* supra, where the defendant appealed his conviction of robbery in the first degree, this court considered a jury instruction similar to the one attacked here. After the trial

---

[6] Almost immediately after the instruction objected to and while still speaking of the accessory statute, the court said: "It is clear that to establish the guilt of an accused as an accessory for aiding and abetting the criminal act of another the State must prove criminality of intention and community of unlawful [purpose]."

court read the provisions of the accessory statute to the jury, it said: "No question has been raised concerning Mr. Teart's mental state, so you can treat him as having the mental state required for the commission of a crime. So under this section of the statute I have just read to you, if you find beyond a reasonable doubt that Mr. Vereen [the principal] did commit robbery in any specific degree, and you also find, beyond a reasonable doubt, that Mr. Teart did aid Mr. Vereen within the meaning of the law which I have just given you, you would find Mr. Teart guilty of robbery in the same degree which you have found Mr. Vereen guilty of." *State* v. *Teart,* supra, 335. The court did not define "mental state." In setting aside the judgment of the trial court, we stated: "It is clear that to establish the guilt of an accused as an accessory for aiding and abetting the criminal act of another the state must prove criminality of intent and community of unlawful purpose." *State* v. *Teart,* supra, 336. One of the bases for our conclusion of error in *Teart* was "the failure of the court to instruct the jury as to the state's burden of proof . . . as to his [Teart's] mental state and intention . . . ." *State* v. *Teart,* supra, 336.

In the light of *Teart* and later decisions by this court[7] we hold that the challenged instruction in this case constitutes harmful error. The instruction effectively directed a finding of guilty on the issue of the defendant's intent on the issue of his being an accessory to robbery, thus relieving the state of its burden to prove an essential element of the

[7] See, e.g., *State* v. *Arroyo,* 180 Conn. 171, 176, 429 A.2d 457 (1980); *State* v. *Harrison,* 178 Conn. 689, 695–96, 425 A.2d 111 (1979); see also *Sandstrom* v. *Montana,* 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979).

crime. See *Mullaney* v. *Wilbur,* 421 U.S. 684, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975); *In re Winship,* 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *State* v. *Griffin,* 175 Conn. 155, 162, 397 A.2d 89 (1978). An instruction which has that effect is clearly unconstitutional and deprives a criminal defendant of his right to due process of law. See *Sandstrom* v. *Montana,* 442 U.S. 510, 524, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979); *State* v. *Arroyo,* 180 Conn. 171, 176, 429 A.2d 457 (1980).

The state claims that when viewed as a whole, the challenged portion of the charge is rendered harmless. Having reviewed the instruction as a whole, and being careful not to sever the challenged portion and analyze it in isolation from the rest; see *State* v. *Harrison,* 178 Conn. 689, 693, 425 A.2d 111 (1979); *State* v. *Roy,* 173 Conn. 35, 40, 376 A.2d 391 (1977); see also *Cupp* v. *Naughten,* 414 U.S. 141, 94 S. Ct. 396, 38 L. Ed. 2d 368 (1973); we disagree. The state, in its claim, points to portions of the court's general charge on the burden of proof[8] and to other language used in its charge on the accessory statute. As to the latter, the state particularly urges that the instruction almost immediately following the challenged portion had the effect of correcting any possible error. That allegedly correcting charge read: "[I]t is clear that to establish the guilt of an accused as an accessory for aiding and abetting the criminal act of another the state must prove criminality of intent and commun-

---

[8] For example, in the beginning of its instructions, the court charged: "[T]he State will have to prove every element necessary to constitute these offenses . . . [i]t is not enough that the State prove certain of these elements . . . ." The court also ended its entire charge by stating: "I again emphasize that the burden of proof upon the prosecutor extends to every element of the crimes charged."

ity of unlawful [purpose]." We note that although other instructions may be adequate to overcome the potential for confusing the jury on the issue of the burden of proof; *State* v. *Vasquez,* 182 Conn. 242, 250–51, 438 A.2d 424 (1980); *State* v. *Arroyo,* 180 Conn. 171, 175–76, 429 A.2d 457 (1980); *State* v. *Harrison,* 178 Conn. 689, 697, 425 A.2d 111 (1979); they must clearly delineate the state's burden of proof with regard to every element of the crime charged, and they must, when considered together, overcome the damage caused by the harmful portion. *State* v. *Arroyo,* supra, 176; *State* v. *Harrison,* supra, 697. We hold that the harm occasioned by the very conclusive nature of the challenged instruction was not overcome by other portions of the charge, including that which almost immediately followed the objectionable instruction. In our view, without further explanatory instructions on the intent required to be proven under the accessory statute, this charge tended to confuse rather than to make clear to the jury the issue of intent. In such circumstances, careful attention must be given to the actual words spoken to the jury because whether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable juror could have interpreted the instruction. See *Sandstrom* v. *Montana,* supra, 514; *State* v. *Arroyo,* supra, 175. It is clear that a reasonable juror could have viewed the instruction as conclusively relieving the state of its burden on the element of intent under the accessory statute.

The state also claims that any error in the instructions on the accessory statute was harmless because this case was not "a true accessory case" because the defendant was actually a "co-participant or principal" in the robbery. This claim is without

merit. The state requested the court to charge on the accessory issue. Because we do not know whether the jury found the defendant guilty under the robbery count as a "co-participant or principal" or as an accessory, we cannot say that the error is harmless.

The claim of the state that the error is harmless because of the defense of alibi necessitates little discussion. It is sufficient to say that although the defense was that the defendant was not at the scene of the crime, this hardly lessens in any degree the state's burden of proving every element of the crime charged.

Finally, we address the defendant's contention that the erroneous charge "infected" the entire charge so as to require a remand of the entire case. In this case the challenged instruction was given solely in connection with the accessory instruction in the robbery charge in the first count. It was only with respect to that count that the accessory charge was given because the evidence indicated that it was not the defendant who actually took the $81 from Davis' wallet. A review of the entire charge. discloses that the court gave separate instructions with regard to the other crimes charged, that there were no instructions on or references to the accessory statute as to any of those other crimes, and that the court specifically instructed on the element of intent as applicable to those other crimes.[9] Thus, it is extremely unlikely that the erroneous instruction "infected" the entire charge and would cause a reasonable juror to believe that the state did not have to prove the defendant's criminal intent with respect

---

[9] The exceptions taken to the challenged instructions do not disclose any claim that it had any "spillover" effect as to any of the other crimes.

to all the other charges. In a proper case where the error relates only to separable issues covered by the judgment, and the issues are not so interwoven that justice demands a new trial of the entire case, the case may be reversed as to those separable issues only. See General Statutes § 52-266; Maltbie, Conn. App. Proc. § 350; 5 Am. Jur. 2d, Appeal and Error § 953; see also *State* v. *Moore,* 158 Conn. 461, 262 A.2d 166 (1969); *State* v. *Fasano,* 119 Conn. 455, 177 A. 376 (1936). This is such a case.

There is no error as to the second count (unlawful restraint in the first degree, § 53a-95), third count (burglary in the first degree, § 53a-101 [a]) and fourth count (possession of burglary tools, § 53a-106 [a]); there is error in the judgment as to the first count (robbery in the first degree, § 53a-134 [a] [2]), the judgment is set aside and the case is remanded for a new trial on the first count only.

In this opinion the other judges concurred.