## STATE OF CONNECTICUT *v.* WILBERT HINTON
## (11357)

HEALEY, PARSKEY, SHEA, DANNEHY and ASPELL, Js.

Argued January 11—decision released May 28, 1985

*Robert F. McWeeny,* for the appellant (defendant).

*Roland D. Fasano,* assistant state's attorney, with whom, on the brief, was *Arnold Markle,* state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. The defendant was convicted by a jury on three counts of sexual assault in the first degree, one count of burglary in the first degree, and one count of robbery in the first degree. On appeal, he claims that the trial court erred in denying his motion

to suppress pretrial identifications and in denying his motion for production of "statements" of the victim contained in police reports and in notes of police officers. As to the latter, the defendant claims alternatively that such reports and notes should have been marked for identification and inspected in camera by the trial court. We disagree and find no error.

The facts underlying the crime do not appear to be in dispute.[1] C, a thirty-one year old woman, was living in a first floor New Haven apartment when this incident occurred. On July 9, 1981, she awoke sometime between 5:30 and 6 a.m. and, to obtain some relief from the heat, she opened the back kitchen door, leaving the outside screen door unlocked. She then fell asleep on the living room couch. At approximately 7 a.m., C awoke and saw a man, later identified as the defendant, standing about fifteen feet away from her in the apartment. It was "light out," "very sunny," at the time and the apartment was "very bright." Her living "room" and dining "room" were "really one room," just different areas and there were no draperies or blinds on the front windows. There were eight-foot windows in this combination living and dining room. The defendant had a chrome kitchen knife and said to C, "Don't move or I'll kill you." The defendant was wearing a gray sweatshirt, which he had "pulled up over his mouth." He walked over to C and held the knife to her neck. C had a clear view of her assailant's face except for the mouth area.

With the knife still at her throat, the assailant ordered her to go into the bathroom and kept repeating that he was going to kill her. He closed the door and told her to stand facing the wall. He demanded the

---

[1] The defendant did not dispute that the crimes charged occurred. The "theory of the defense at trial"; *Levine* v. *Manson,* 195 Conn. 636, 645, 490 A.2d 82 (1985); was that the defendant was not the person who committed these crimes. To that end, the defendant offered evidence of alibi.

jewelry that she was wearing and then ordered her to turn around and disrobe. The assailant then sexually assaulted C three times in the bathroom, and he kept up a "steady conversation" during the assaults. After these sexual assaults, the assailant "wiped" himself and other items in the bathroom. C was then able to view his profile "very clearly," although she was unable to see his mouth. He subsequently left the bathroom, closed the door, and left the apartment. The assailant was in the presence of the victim for approximately twenty minutes.

Later on the day of the incident, C made two photo identifications of the defendant as her assailant. On July 17, 1981, C also identified the defendant, who was among a group of arraignees in a New Haven court-room. At trial, C made an in-court identification of the defendant as her assailant. Evidence of her out-of-court identifications was also admitted.

I

The defendant on appeal contends that the trial court erred in denying his motion to suppress pretrial identifications.[2] The victim had made two photographic identifications of the defendant at the police station within hours after these crimes and had also identified him eight days later in court at his arraignment on an unrelated offense.

After the incident, C immediately telephoned the police, who responded and then took her to a hospital. Following her examination there, she was taken

[2] Prior to trial, the defendant filed a "Motion to Suppress Eye Witness Identification and/or Photographic Identification." This motion requested the suppression of any in-court identification as well as the out-of-court identification of the defendant. The defendant on appeal, however, briefs and argues only the issue of the denial of that motion as it related to the "pretrial identifications." We therefore consider abandoned any claim regarding in-court identifications made at trial. State v. Samaha, 180 Conn. 565, 565 n.1, 430 A.2d 1290 (1980).

directly to the police station. There the investigating detective, Raymond DellaCamera, placed "five or six trays" of photographs before her. He did not indicate, however, that the police suspected any particular individual of the crime. On the average, the trays each contain "between 150 and 200" photographs of black males. C began examining the photographs, and soon after she had begun she identified one positively as that of her assailant. She pointed out the photograph to the detective, and he then left the room and set up another full tray containing a more recent photograph of the black male she had already identified. Upon going though this tray, C identified the second photograph of this black male as soon as she came to it.

On July 17, 1981, C was taken by another detective, Joseph Reynolds, Jr., to the New Haven courthouse "to view black males" who were being arraigned there. The detective told C "to look around the courtroom, see if she would recognize him, be able to identify the subject that assaulted her, and that he may not be in the courtroom." There were thirteen male arraignees seated together on the left side of the courtroom: Seven were black, two hispanic, and four white. The defendant, who was one of the arraignees, was born on June 30, 1953; the birthdates of the other six black arraignees were September 22, 1961; September 4, 1964; April 9, 1960; June 27, 1957; January 11, 1947; and October 17, 1921. C was able to identify her assailant "right away" and reported it to the detective, who sat away from her. Upon her request, C returned to the courtroom to see him standing and hear him speak. She did and informed the detective that she had no question that it was "the same guy."

We have recently reiterated that " '[i]n determining whether identification procedures violate a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be deter-

mined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on examination of the "totality of the circumstances." ' *State* v. *Theriault,* 182 Conn. 366, 371–72, 438 A.2d 432 (1980); see *Manson* v. *Brathwaite,* 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977)." *State* v. *Austin,* 195 Conn. 496, 499, 488 A.2d 1250 (1985). "A defendant who moves to suppress identification evidence bears the initial burden of proving that the identification resulted from an unconstitutional procedure." *State* v. *Fullwood,* 193 Conn. 238, 244, 476 A.2d 550 (1984); *State* v. *McKnight,* 191 Conn. 564, 570, 469 A.2d 397 (1983); *State* v. *Hafner,* 168 Conn. 230, 235, 362 A.2d 925, cert. denied, 423 U.S. 851, 96 S. Ct. 95, 46 L. Ed. 2d 74 (1975). The defendant challenges the trial court's ruling that there was "no evidence" of "impermissible suggestiveness" or of "a substantial likelihood of misidentification."[3] To prevail on this claim, the defendant must demonstrate that the trial court erred in *both* of its determinations regarding "suggestiveness" and "reliability" of identifications in the totality of the circumstances. See, e.g., *State* v. *Vass,* 191 Conn. 604, 611, 469 A.2d 767 (1983); *State* v. *Hafner,* supra, 240–41.

---

[3] In denying the defendant's motion to suppress the identifications, the trial court stated: "The woman was a very good witness. If you remember, she did say, very tellingly, that she was sure and absolute of identification because there was a photographic image in her mind.

"It seems to me that every reasonable precaution was taken by the police to protect your client's constitutional rights. I find no evidence that there was impermissible suggestiveness. I can further find that there was no evidence that there is a substantial likelihood of misidentification, based on what I heard.

"So that the State has done what it has to do and the defense has not been able to persuade me that it's sustained its burden. If anything, I think the procedure adopted by the police in this case is a model for fair, just and honest identification."

The defendant contends that the photographic display was suggestive because of the recurrence of a "single" photograph of the defendant in two separate displays and because "the photographic display was not segregated in any way but race and sex, containing black males of all sizes, ages and with and without beards." The factual premise of this claim is erroneous, however. The second identification of the defendant's photograph involved a "newer photo" of him, not a "recurrence of a single photo" as the defendant's brief suggests. While "we have recognized that pictorial recurrence can be suggestive in that it increases the risk of misidentification"; *State* v. *McKnight,* supra, 572; *State* v. *Ledbetter,* 185 Conn. 607, 613, 441 A.2d 595 (1981); the initial identification in this case was made with such a "high degree of assurance" that the second identification procedure involving a more recent photograph could only have benefitted the defendant. *State* v. *Austin,* supra, 502. Moreover, the defendant makes no claim of improper procedure such as the "unduly suggestive" police comments we criticized in *State* v. *Austin.*[4]

The defendant, in his second attack on the photographic arrays, complains that they were not segregated in terms of size, age, and facial hair. In his brief, however, the defendant fails to indicate in what manner the arrangement of the photographic array emphasized the defendant's photograph as he seems to suggest. See *State* v. *Vass,* supra, 610–11; *State* v. *Gold,* 180 Conn. 619, 655–56, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980). The complainant's initial identification was made from one photograph of the defendant situated randomly in one of the trays without any suggestion whatsoever from the police. To the extent that the mul-

---

[4] Our review of the record reveals that no basis for any such claim existed in this case.

titudinous photographs in this case were of black males of differing sizes, ages, and facial hair, the defendant challenged the complainant's testimony regarding the photographic identification. "Such challenges go to the weight rather than to the admissibility of the evidence." *State* v. *Ledbetter,* supra, 612; see also *State* v. *Miles,* 195 Conn. 552, 556, 489 A.2d 373 (1985). The record indicates that, upon his cross-examination of the complainant, the defendant availed himself of the opportunity to attempt to discredit her photographic identification.

Nor can we say that, under the circumstances, the procedure for identification at arraignment was so suggestive as to be constitutionally infirm. The complainant had previously made two positive photographic identifications. As the state points out, only the defendant stood to benefit by subsequent identification procedures once he had already been positively identified by photograph. While we have recognized that an arraignment identification may be "suggestive";[5] see *State* v. *Ledbetter,* supra, 613; we point out that all three of the complainant's identifications were " ' "nevertheless reliable based on examination of the 'totality of the circumstances.' " ' " (Citations omitted.) *State* v. *Fullwood,* 193 Conn. 238, 244, 476 A.2d 550 (1984).

The constitutional test for reliability requires the trial court to consider "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior descrip-

---

[5] In *State* v. *Ledbetter,* 185 Conn. 607, 441 A.2d 595 (1981), the victim, two weeks after the crime and one week after making a photographic identification, "identified the defendant [who was black] from among eight individuals, three of whom were black, being arraigned individually [in court] . . . on other charges." Id., 609. We said that "[t]he mischief involved in the arraignment observation is the real possibility that the victim of one crime, armed with the knowledge that the suspect is being charged with another crime, possibly of the same character, is more likely to leap to the conclusion that the person being arraigned in front of him [or her] committed both crimes." Id., 613.

tion of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself." *Manson* v. *Brathwaite,* 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); *State* v. *Theriault,* supra, 373–74.

The complainant testified that she had two opportunities to view her assailant clearly. First, she awoke to find him in the apartment fifteen feet away directly facing her and observed him then walk directly up to her in a bright, sunlit room. Second, after the assaults she viewed his profile in the bathroom with the light on; he stood right next to her, during which time she attempted to view him. We have said of identification that "*a* good hard look will pass muster even if it occurs during a fleeting glance." (Emphasis added.) *State* v. *Ledbetter,* supra, 615. The assailant was in the complainant's apartment for approximately twenty minutes. Although the assailant did have his sweatshirt pulled up over his mouth during C's first observation of him, he was no longer "holding the covering over his mouth" when she observed his profile in the bathroom. She testified at the pretrial hearing that she had made "a conscious effort" to view her assailant. Her initial description of her assailant was that of a black male in his middle twenties, five feet nine inches tall, slim, dark complexion, short curly hair, and wearing a gray sweatshirt with hood, faded blue jeans and sneakers. The defendant in fact was twenty-eight years old, approximately five feet seven inches tall, dark complected with short curly hair. All three of her identifications, the record indicates, were made with a very high degree of certainty, and she was absolutely positive of her identification of the defendant at each step of the proceedings. The two photographic identifica-

tions were made the day of the incident, and the arraignment identification occurred eight days later.[6]

Nor does any "corrupting effect" of the potentially suggestive arraignment identification procedure outweigh the reliability of the complainant's identifications. *Manson* v. *Brathwaite*, supra; *State* v. *Theriault*, supra. Although the complainant knew the defendant's name by the time of the courtroom arraignment identification, she testified that she did not hear his name mentioned during that proceeding in court. Under all the circumstances, the conclusion of the trial court that the identifications did not violate the defendant's constitutional rights was correct. We conclude, therefore, that the trial court did not err in denying the defendant's motion to suppress the pretrial identification.

## II

The defendant's other claim of error relates to the trial court's denial of his requests to obtain production of "statements" made by the complainant that were contained in police reports and notes. After direct examination of the complainant, the state turned over the written statement given by her to the police on July 9, 1981, and signed by her on July 12. The defendant then requested the opportunity to conduct "a

[6] Although the defendant attacks both the complainant's initial description and the composite drawing, we cannot say that the totality of the circumstances indicates that the trial court erred in denying the motion to suppress. Again, any such discrepancies go to the weight of the evidence rather than to the constitutionality of the identification procedures. *State* v. *Ledbetter*, 185 Conn. 607, 612, 441 A.2d 595 (1981). The police officer who made the composite sketch of the assailant after talking to the complainant testified that it took longer than usual to do so and that thirteen changes were made before it was completed. This indicated to him that she "was being as particular as she possibly could to come up with as best a composite as possible." He acknowledged that the kit from which the composite is made has "limitations" and that even when the composite was finished, the complainant "wasn't totally satisfied" with the sketch. A copy of this composite sketch was an exhibit in evidence at the trial as well as at the suppression hearing.

Jencks voir dire of the witness, to determine whether there are other statements, or other pieces of information, which should be made available pursuant to [§] 749 of the Practice Book." The defendant specifically requested any notes taken by the investigating officers and "perhaps any other statements, question and answer sessions, etc., conducted in this case." He also requested production of "those sections of the police officer's report which recite what the police officer wrote down at—later on, pursuant to what he discovered at an earlier time." The defendant maintained that he "should not be denied the right to at least have those notes [and] police reports, brought in for at least in camera inspection."[7] The trial court denied the motion and an exception was taken. Prior to the cross-examination of the complainant, the defendant again requested the opportunity to voir dire her regarding statements she gave to the police.[8] The trial court denied the request and again an exception was taken.

---

[7] The defendant also said to the trial court: "And, your Honor, only so the record is perfectly clear for purposes later on, what I am seeking at the moment are two things. Number one—two things, specifically. Number one, portions of any police reports in which the police officer has written down any oral statements, whatever, made by this witness. And number two, notes of the officers themselves—the notes, rather, made by the officers at the time that that information or that statement was made, *as statement is defined in Section 749*. And, again, I'm not questioning anybody's veracity, but I just want to make absolutely clear, that is my function." (Emphasis added.)

[8] The defendant stated to the trial court in the absence of the jury: "Your Honor, I would like a brief opportunity, so the record will be clear, to voir dire this witness along the lines concerning the statements, to protect the record, and indicate that she was in fact interviewed by Officer Woods at the scene, that she was in fact interviewed by Officer DellaCamera at the scene, and the descriptions and so on was given at that time. Also, that she was—a composite drawing was made, and questions and so on were asked at that point. Also, there was a photo ID session and that there was conversation between her and the police officer, Detective DellaCamera. Likewise, that there was a courtroom [arraignment] identification and that there was [sic] conversations between her and Detective Reynolds." The state then said: "There shouldn't be any separate cross-examination *with-*

During the course of the trial and following their direct testimony, the defendant was given the reports prepared by the police officers. The complainant, although under subpoena for the duration of the trial and specifically asked by defense counsel to remain under subpoena, was never recalled by the defendant for further examination for any purpose.

On appeal, the defendant claims that "[t]he court erred in denying the defendant's motion for production of statements of the victim contained in police reports and notes of police officers; and/or in denying the defendant's alternative claim that such police reports and notes be marked for identification and inspected by the court in camera." The state responds that all of the materials that arguably contained "statements" of the witness, pursuant to the relevant Practice Book provisions on disclosure, were ultimately turned over to the defendant and that Practice Book § 753 (Delivery and Excision of Statements) was not applicable to this situation. The state also argues that the defendant could have recalled the complainant and examined her regarding those reports.

"Under some circumstances, [Practice Book] § 752 authorizes a defendant to obtain for the purpose of cross-examining a witness the officer's record of an interview." *State* v. *Anonymous (83–FG),* 190 Conn. 715, 734, 463 A.2d 533 (1983).[9] "Practice Book § 749

out *the jury present* for that purpose. This has already been covered in pretty good detail with respect to various conversations between police officers, various interviews and so on. So it's a matter of record that it already was done at some point. Certainly, there shouldn't be two separate cross-examinations." (Emphasis added.) The trial court denied this request and thereafter such matters were inquired of on the complainant's cross-examination in the presence of the jury.

[9] "[Practice Book]

"Sec. 752. —— ——PRODUCTION FOLLOWING TESTIMONY

"After a witness called by the state has testified on direct examination at trial, the judicial authority shall, on motion of the defendant, order the

limits the disclosures governed by §§ 748 through 755 to two categories of materials: '(1) A written statement made by a person and signed or otherwise adopted or approved by him; or (2) A stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by a person and recorded contemporaneously with the making of such oral statement.' " *State v. Myers,* 193 Conn. 457, 470, 479 A.2d 199 (1984). "[A] police officer's interview notes may be subject to disclosure for use by the defendant in cross-examining the witness, if the officer's notes meet either of § 749's alternate definitions of a statement. The notes may also be discoverable following the officer's own testimony if they are 'signed or otherwise adopted.' " Id.; *State v. Anonymous (83-FG),* supra.[10]

We point out that Practice Book § 749, which defines the term "statement," tracks substantially the Jencks Act definition of that term. See 18 U.S.C.A. § 3500 (e); *State v. Shaw,* 185 Conn. 372, 385–86, 441 A.2d 561 (1981), cert. denied, 454 U.S. 1155, 102 S. Ct. 1027, 71 L. Ed. 2d 312 (1982). We have had occasion recently to look to the Jencks Act in interpreting our rules of practice concerning the "Disclosure of Statements." See, e.g., *State v. Myers,* supra, 458–71; see also *State v. Anonymous (83-FG),* supra, 731–36. "The [Jencks] Act is a limited statutory scheme which serves the concurrent purposes of aiding the search for truth by facilitating the impeachment of a witness who has given a statement to the government, while at the same time regulating access by the defense to materials and evidence within the government's possession. See *Palermo*

state to produce any statement of the witness in the possession of the state or its agents, including state and local law enforcement officers, which statement relates to the subject matter about which the witness has testified."

[10] We should observe that the defendant makes no claim in this case that the state had not complied with his motion for discovery of exculpatory material.

v. *United States,* 360 U.S. 343, 354, 79 S. Ct. 1217, 3 L. Ed. 2d 1287 (1959); *Hardy* v. *United States,* D.C. App., 316 A.2d 867, 869 (1974); *United States* v. *Dockery,* D.C. App., 294 A.2d 158, 161 (1972); *United States* v. *Catalano,* 491 F.2d 268, 274 (2d Cir.), *cert. denied,* 419 U.S. 825, 95 S. Ct. 42, 42 L. Ed. 2d 48 (1974)." *March* v. *United States,* 362 A.2d 691, 698 (D.C. App. 1976) (assault with intent to commit rape and sodomy). "The purpose of the Jencks Act was to provide the defense with the means of impeaching a government witness by means of a prior inconsistent statement . . . while not allowing an unrestrained search through government files." *United States* v. *Catalano,* 491 F.2d 268, 274 (2d Cir.), cert. denied, 419 U.S. 825, 95 S. Ct. 42, 42 L. Ed. 2d 48 (1974); see *Palermo* v. *United States,* 360 U.S. 343, 354, 79 S. Ct. 1217, 3 L. Ed. 2d 1287 (1959); *Menendez* v. *United States,* 393 F.2d 312, 316 (5th Cir. 1968), cert. denied, 393 U.S. 1029, 89 S. Ct. 639, 21 L. Ed. 2d 572 (1969); *Fields* v. *United States,* 368 A.2d 537, 540–41 (D.C. App. 1977); *State* v. *Horn,* 282 N.W.2d 717, 721 (Iowa 1979). Where, as in this case, the defendant has requested materials from the state, the threshold inquiry is whether those requested fall within the provisions of Practice Book § 749. This is because any such materials must be produced only to the extent that they are "statements" as defined in Practice Book § 749. *Goldberg* v. *United States,* 425 U.S. 94, 105, 96 S. Ct. 1338, 47 L. Ed. 2d 603 (1976); see *State* v. *Myers,* supra, 470–71.

Although the defendant does not specifically claim that the trial court erred in denying the opportunity to voir dire the complainant to determine whether any other materials constituted "statements" by her within the meaning of § 749, any error the trial court may have committed was harmless under the circumstances. See *Rosenberg* v. *United States,* 360 U.S. 367, 371, 79 S.

Ct. 1231, 3 L. Ed. 2d 1304 (1959). We have recognized that "[s]ince the defendant has no constitutional right to the statements of a prosecution witness, the defendant has the burden of establishing the probability of such harm." *State* v. *Anonymous (83–FG), supra,* 736. We conclude that, under the circumstances detailed below, the defendant has not sustained his burden.

As we have stated in *State* v. *Myers, supra,* 470, a police officer's interview notes may be discoverable "following the officer's own testimony" showing the materials in question were "signed or otherwise adopted or approved" by the complainant. Practice Book §§ 749, 752. A review of the record indicates that the defendant ultimately received all the police reports requested[11] and that he failed to establish that the "notes" requested were disclosable "statements" within the Practice Book definition. We will, nevertheless, thus survey the pertinent proceedings at trial.

Officer Edward Woods was the first police officer to respond to the complainant's initial call to the police immediately following the incident. The description of the assailant she gave to Woods, which was included in his report, was provided to the defendant during the pretrial hearing on the motion to suppress. After Woods' direct testimony at trial, the defendant was given the officer's full report and was permitted to voir dire this officer outside of the jury's presence on the issue of his notes. During the voir dire, Woods testified that his notes were no longer in existence but all information "pertinent to the investigation" was included in his report. The record indicates that the defendant failed to establish that any notes Woods might have taken were signed, adopted, or approved

---

[11] The defendant specifically requested the reports and notes of Officer Woods, Detective DellaCamera, Detective Reynolds and Lieutenant Flaherty (who assembled the composite).

by the complainant so as to constitute disclosable "statements" under Practice Book §§ 749 and 752.

After Detective DellaCamera, the next police witness, testified on direct examination, his full report was given to the defendant. Unlike Woods, DellaCamera had notes, and these notes were marked for identification and apparently "examined" by the trial court. The record again indicates no basis for disclosure of them as a § 749 statement of the complainant.[12] The full report prepared by Detective Reynolds was turned over to the defendant following his direct examination, but the defendant chose not to voir dire him regarding any notes, nor did the defendant establish during cross-examination the necessary § 749 threshold regarding any such notes.[13] The defendant did conduct a voir dire of Lieutenant Thomas E. Flaherty, the officer who produced the composite drawing of the defendant, regarding the existence of notes. Flaherty, who testified after Woods and DellaCamera, said that he had taken notes from interviewing the complainant but that they were identical to the information included in the "composite form," an exhibit offered into evidence by the state.[14]

---

[12] We point out that Detective DellaCamera's notes were incorporated into his report, and he so testified. In addition, the record indicates that DellaCamera was not questioned on voir dire regarding the notes, although he was cross-examined extensively regarding "statements" and descriptions provided by the complainant.

Officer Woods had been questioned on voir dire by the defendant concerning his notes. That officer testified that he did not have them as he had thrown them away and that everything pertinent in them had been put into his written report which had been given to the defendant.

[13] Detective Reynolds was not cross-examined regarding the subject of his notes even though he was called as a witness by both the state and the defense.

[14] The defendant did voir dire Lieutenant Flaherty concerning notes but made no further requests for Flaherty's notes at trial. Flaherty testified that while notes were taken, they were identical with the information on the composite sketch form that was in evidence at the trial.

Moreover, the complainant herself, although questioned thoroughly during cross-examination regarding descriptions and "statements" she had given to the various officers, never testified that she had signed, adopted or approved any *notes* taken by any one of them that would be within § 749. We note that the defendant chose not to recall the complainant to the stand to attempt to satisfy the threshold § 749 requirements.[15]

In sum, all police reports requested by the defendant were turned over during the course of trial. The defendant did not establish, however, that any police officers' notes constituted "statements" of the complainant within the meaning of Practice Book § 749.[16] See *State* v. *Myers,* supra, 470. Further, the defendant has not made any showing of the probability of harm resulting from the trial court's failure to permit a voir dire of the complainant regarding the field notes. See *State* v. *Anonymous (83–FG),* supra, 736.

There is no error.

In this opinion the other judges concurred.

---

[15] We imply no criticism of the trial defense counsel in this regard as he obviously had made a tactical decision not to recall the complainant, who had consistently identified the defendant as her assailant.

[16] Accordingly, we need not address the defendant's claim that the trial court should have inspected in camera notes prepared by the officers. See Practice Book § 753; *State* v. *Gonzales,* 186 Conn. 426, 441 A.2d 852 (1982). We note that the defendant has made no claim that any notes by any police officer who testified were destroyed out of any improper purposes.