STATE OF CONNECTICUT *v.* FREDDY PAYNE
(13998)

PETERS, C. J., COVELLO, HULL, BORDEN and SANTANIELLO, Js.

94

Argued February 19—decision released May 21, 1991

*Donald D. Dakers,* public defender, for the appellant (defendant).

*Leon F. Dalbec, Jr.,* assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, and *Elpedio Vitale,* assistant state's attorney, for the appellee (state).

SANTANIELLO, J. The defendant appeals from the judgment of conviction of the crimes of burglary in the third degree with a firearm in violation of General Statutes § 53a-103a (a),[1] robbery in the first degree in violation of General Statutes § 53a-134 (a) (4),[2] larceny in the first degree in violation of General Statutes § 53a-122 (a) (2),[3] and kidnapping in the first degree in

---

[1] "[General Statutes] Sec. 53a-103a. BURGLARY IN THE THIRD DEGREE WITH A FIREARM: CLASS D FELONY: ONE YEAR NOT SUSPENDABLE. (a) A person is guilty of burglary in the third degree with a firearm when he commits burglary in the third degree as provided in section 53a-103, and in the commission of such offense, he uses or is armed with and threatens the use of or displays or represents by his words or conduct that he possesses a pistol, revolver, shotgun, rifle, machine gun or other firearm. No person shall be convicted of burglary in the third degree and burglary in the third degree with a firearm upon the same transaction but such person may be charged and prosecuted for both such offenses upon the same information."

[2] "[General Statutes] Sec. 53a-134. ROBBERY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm; except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a weapon from which a shot could be discharged. Nothing contained in this subdivision shall constitute a defense to a prosecution for, or preclude a conviction of, robbery in the second degree, robbery in the third degree or any other crime."

[3] "[General Statutes] Sec. 53a-122. LARCENY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of larceny in the first degree when he commits larceny as defined in section 53a-119 and . . . (2) the value of the property or service exceeds ten thousand dollars."

violation of General Statutes § 53a-92 (a) (2) (B).[4] The defendant claims that the trial court improperly: (1) allowed the state, in its case-in-chief, to introduce evidence of the defendant's commission of a subsequent crime in order to prove identity; (2) allowed one of the victims, Allyson Brownlow, to testify as to her pretrial identification of the defendant while he was being arraigned on unrelated charges; (3) prohibited the defendant from cross-examining Allyson Brownlow on the effect that her observation of photographs of the defendant, mailed to her by the defendant prior to trial, had on her in-court identification of the defendant; (4) excluded the testimony of Michelle Gary as to incriminating statements made to her by the defendant's brother, Donald Payne; and (5) excluded evidence that a third party committed the crimes charged. We conclude that the trial court improperly allowed evidence of the defendant's commission of a subsequent crime in order to prove identification, and that this improper admission constituted harmful error. As to the other issues, we affirm the trial court's rulings. Accordingly, we reverse the conviction, and remand the case for a new trial.

The jury might reasonably have found the following facts. On November 20, 1988, the victims, Allyson and James Brownlow, resided in a single family, three story house located at 683 Prospect Street in New Haven. At approximately 6 a.m., they were awakened by two black men with guns who had burst through their bedroom door and turned on the lights. The first man went to Mr. Brownlow's side of the bed and pointed a gun

[4] "[General Statutes] Sec. 53a-92. KIDNAPPING IN THE FIRST DEGREE: CLASS A FELONY (a) A person is guilty of kidnapping in the first degree when he abducts another person and when . . . (2) he restrains the person abducted with intent to . . . (B) accomplish or advance the commission of a felony."

at him, while the second man, identified as the defendant, went to Mrs. Brownlow's side of the bed and pointed a gun at her. The Brownlows were ordered to roll over onto their stomachs in bed. As she lay on her stomach, Mrs. Brownlow's face was turned so that she could observe the defendant. The defendant kept his gun pointed at Mrs. Brownlow while he rifled through the dresser drawers on her side of the bed and removed various pieces of jewelry. During part of this time, the defendant was a foot to a foot and a half away from Mrs. Brownlow. During the entire time spent in the Brownlows' bedroom, the defendant wore a fiberglass painter's mask covering his mouth and the lower part of his nose. At one point, when the defendant's partner became agitated because the Brownlows did not have enough cash in the house, Mrs. Brownlow sat up in bed, took off her engagement ring and handed it to the defendant to try to calm the partner. Mrs. Brownlow got a "very good look" at the defendant as she handed the ring to him, and then she lay on her side and continued to observe him. After ten to fifteen minutes had elapsed, the defendant and his partner left the victims' second floor bedroom, went downstairs and left the house through the kitchen door. Mr. Brownlow phoned the police. After the police arrived, it was discovered that a locked kitchen window on the first floor had been forced open.

The jury found the defendant guilty of the crimes charged, and he was thereafter sentenced to a total effective term of twenty-five years imprisonment. The defendant appealed to this court pursuant to General Statutes § 51-199 (b) (3).[5]

---

[5] General Statutes § 51-199 (b) (3) provides: "The following matters shall be taken directly to the supreme court . . . (3) an appeal in any criminal action involving a conviction for a capital felony, class A felony, or other felony, including any persistent offender status, for which the maximum sentence which may be imposed exceeds twenty years."

## I

The defendant first claims that the trial court improperly permitted the state, in its case-in-chief, to introduce evidence of the defendant's commission of a subsequent crime in order to prove identity. We agree that the admission of this evidence was both improper and harmful.

The rules governing the admissibility of evidence concerning the defendant's commission of a subsequent unconnected crime are well established. Such evidence is inadmissible to prove the defendant's bad character or propensity for criminal behavior. *State* v. *Crosby,* 196 Conn. 185, 190, 491 A.2d 1092 (1985); *State* v. *Carsetti,* 12 Conn. App. 375, 380, 530 A.2d 1095, cert. denied, 200 Conn. 809, 537 A.2d 77 (1987). " ' "Evidence of other misconduct, however, 'may be allowed for the purpose of proving many different things, such as intent, identity, malice, motive or a system of criminal activity'; *State* v. *Ibraimov,* [187 Conn. 348, 352, 446 A.2d 382 (1982)]; or an element of the crime. *State* v. *Falby,* 187 Conn. 6, 23, 444 A.2d 213 (1982)." *State* v. *Braman,* 191 Conn. 670, 675–76, 469 A.2d 760 (1983); *State* v. *Ryan,* 182 Conn. 335, 337, 438 A.2d 107 (1980).' *State* v. *O'Neill,* 200 Conn. 268, 273, 511 A.2d 321 (1986)." *State* v. *Sierra,* 213 Conn. 422, 428–29, 568 A.2d 448 (1990). "To be admitted under one of these exceptions, the evidence must satisfy a two-pronged test: ' "First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions." *State* v. *Braman,* [supra, 676]. Second, the probative value of the evidence must outweigh its prejudicial effect. Id.' *State* v. *Mandrell,* 199 Conn. 146, 151, 506 A.2d 100 (1986)." *State* v. *Sierra,* supra, 429.

Outside the presence of the jury, the state offered the testimony of Detective Frederick Hurley of the New Haven police department concerning his December 16, 1988 arrest of the defendant for attempted burglary. The trial court overruled the defendant's objection to Hurley's testimony and permitted him to testify before the jury. Hurley testified that on December 16, 1988, at approximately 3 a.m., he and his partner were on surveillance in the vicinity of 470 Prospect Street and were dispatched to that address to investigate a report of a burglary in progress. Upon arriving at the scene, Hurley observed two black males huddled together on the front stoop of an apartment, with their backs to the street, directing their attention to the inner front door while the outer screen door was propped open by their bodies. The two men were identified as the defendant and Douglas Antrum. The defendant had in his possession a Playtex dishwashing glove, a white sock and an empty knife case. A knife was found next to the stoop. Antrum had in his possession a screwdriver and the right half of a toy pistol. Hurley found pry marks on the door frame around the lock. The occupants of 470 Prospect Street informed the police that they had been awakened by the sounds of their doorbell ringing and the front door knob being jiggled and shaken and, after looking outside and seeing the two men on the front stoop, they had called the police. Hurley testified that 470 Prospect Street is approximately two blocks from the Brownlow residence. He further testified that 470 Prospect Street is a two story apartment that is part of a "row house" consisting of approximately ten apartments connected in a row.

The trial court found that the proffered testimony of Hurley was "extremely material to the issue of identification." The state has the burden to prove identity as one element of the crime alleged. *State* v. *Perry,* 195

Conn. 505, 521, 488 A.2d 1256 (1985). " 'The first threshold for the use of evidence of other crimes or misconduct on the issue of identity is that the methods used be "sufficiently unique to warrant a reasonable inference that the person who performed one misdeed also did the other." [*State* v. *Ibraimov,* supra, 354].' *State* v. *Crosby,* [supra, 190]. ' "Much more is required than the fact that the offenses fall into the same class. 'The device used must be so unusual and distinctive as to be like a signature.' " *State* v. *Ibraimov,* supra, 354.' *State* v. *Mandrell,* supra, 151–52. In order to determine if this threshold criterion for admissibility was met, we must examine the proffered evidence and compare it to the charged offenses." *State* v. *Sierra,* supra, 430.

In making this comparison, the features common to both crimes must be sufficiently distinctive to warrant a belief that the same person committed both. *State* v. *Ibraimov,* supra. There should not be significant differences in the context and modus operandi of the crimes. See *State* v. *Howard,* 187 Conn. 681, 686, 447 A.2d 1167 (1982).

Hurley's testimony reveals the following common features: both crimes involved burglaries, although the second one was an unsuccessful attempt; the Brownlow residence and the site of the second crime were approximately two blocks apart; private residences were involved in each burglary, although one was a single family home and the other was an apartment in a row house; both crimes were committed in the early morning hours, 3 a.m. and 6 a.m. respectively; the crimes occurred twenty-seven days apart; both crimes involved forced entry through a locked opening; and the defendant was described as wearing two layers of outerwear by witnesses to both crimes. Finally, both crimes were committed in such a manner, and at such a time, that confrontation with the home's occupants would be

likely. It is only this last common feature that can in any reasonable way be characterized as unique or distinctive,[6] but we are not persuaded that this fact alone raises these two crimes to the level of uniqueness required by law. See *State* v. *Murrell,* 7 Conn. App. 75, 82, 507 A.2d 1033 (1986).

Even if we consider all the common features together, the pattern that emerges is not such a distinctive combination of circumstances and actions that a "signature" or "criminal logo" can be discerned.[7] This is particularly true when the significant differences between these two crimes are recognized. In the Brownlow burglary, both perpetrators were armed with handguns. In the subsequent burglary, one perpetrator had one half of a toy gun, and the defendant may have had a knife.[8] In the Brownlow burglary, the house was entered through a rear window facing a wooded back yard. In the subsequent burglary, entry was attempted through the front door, which was thirty feet away from and in plain view of Prospect Street. In the Brownlow burglary, the perpetrators adeptly managed to break in and remove numerous items from the downstairs without awakening the occupants. In the subsequent burglary, the perpetrators ineptly awakened the occupants by ringing their door bell and rattling their front door before they gained entry. In the Brownlow burglary, the defendant wore a fiber-

---

[6] Hurley testified that it is "rare" and "uncommon" for burglars knowingly to take the risks that accompany entry of a house at a time when, in all probability, the occupants will be at home.

[7] Hurley testified that residential burglaries involving bodily force to gain entry are "quite common" in New Haven, and that most burglaries are committed in conjunction with another person. Further, Hurley testified that there had been a rash of burglaries occurring in the Prospect Street area at this time.

[8] The testimony of Hurley established only that the defendant had an empty knife case in his possession, and that a knife was found next to the stoop.

glass painter's mask and his partner wore sunglasses. In the subsequent burglary, neither the defendant nor Antrum wore masks or concealed their facial features in any way, or carried any provisions for doing so. Mrs. Brownlow testified that, during the burglary, the defendant was not wearing noticeable gloves, although she could not tell if he was wearing "sheer" gloves. During the subsequent burglary, the defendant had in his possession a Playtex dishwashing glove.

The existence of significant differences between the two crimes, in combination with the fact that only one of the features common to both crimes, the confrontational nature of them, can be described as unique or distinctive, negates the inference that the person who committed one also committed the other. Consequently, the evidence of the subsequent burglary was not relevant to proving the defendant's identity as the person who committed the Brownlow burglary. Such evidence was improperly admitted.[9]

Our inquiry does not end, however, with the determination that the evidence was improperly admitted. The state argues that any error in the admission of this evidence of a subsequent crime was harmless. We disagree.

The defendant objected at trial to the admission of this evidence, but did not articulate any constitutional basis for his objection. " 'Because the defendant did not claim at trial that the error deprived him of a constitutional right, he bears the burden of proving its harmfulness.' [*State* v. *Conroy,* 194 Conn. 623, 627, 484 A.2d 448 (1984)]." *State* v. *Murrell,* supra, 91. " ' "The

---

[9] Having found that the proffered evidence of the subsequent crime was not relevant or material to proving identity, we need not address the second prong of the test, which is that the probative value of the evidence must outweigh its prejudicial effect. See *State* v. *Sierra,* 213 Conn. 422, 429, 568 A.2d 448 (1990).

defendant must show that it is more probable than not that the erroneous action of the court affected the result. [*State* v. *Ruth,* 181 Conn. 187, 196–97, 435 A.2d 3 (1980)]; *State* v. *McClain,* 171 Conn. 293, 300, 370 A.2d 928 (1976)." *State* v. *Jones,* 205 Conn. 723, 732, 535 A.2d 808 (1988).' *State* v. *Vilalastra,* 207 Conn. 35, 47, 540 A.2d 42 (1988)." *State* v. *Sierra,* supra, 436–37.

In *State* v. *Murrell,* supra, the defendant was arrested for breaking into an automobile and removing a radio. At the trial, the state was permitted to present evidence of the defendant's prior misconduct for the limited purpose of proving identity and common scheme. Although the Appellate Court concluded that it was error to have allowed this evidence for either purpose, it nonetheless held that this error was harmless, in light of the "otherwise substantial case upon which the jury could conclude that the defendant was the perpetrator of these offenses." Id., 91.

The other evidence considered by the jury in *Murrell* included the testimony of the police officer who found the defendant holding the car stereo speakers and who chased the defendant for a brief period of time. The officer testified that he was able to see the defendant's face several times at close range before and during the chase. Id. Furthermore, after the chase, the officer stopped a passing police cruiser and radioed a description of the suspect, including his height and clothing. Id., 77. Finally, the officer positively identified the defendant at trial. Id., 91. The defendant was apprehended only a short time after the incident in question, and the police then found the knobs from the stolen radio in the defendant's jacket pocket. Id.

In the present case, by contrast, the other evidence upon which the jury could have concluded that the

defendant was the perpetrator of the crimes was less substantial. In the absence of the subsequent crime evidence, the case turned upon the in-court and pretrial identifications of the defendant by Mrs. Brownlow, and the testimony of Mr. Brownlow regarding some gestures allegedly made by the defendant at the arraignment.

At trial, Mrs. Brownlow made an in-court identification of the defendant as the second man who had entered her bedroom and pointed a gun at her face. She testified that, during the twelve to fifteen minutes that the defendant was in the bedroom, she was "fixated on him" and that she was "extremely certain" that the defendant was the person in her bedroom, holding a gun to her face and rifling through her dresser. She testified that, during the time he was in her bedroom, she was able to get a very good look at the defendant's eyes, cheekbones, the shape of his face, hair, ears and the general shape of his body.

Mrs. Brownlow testified that, at the time of the burglary, she noticed two distinctive features of the defendant, namely his pointed "widow's peak" hairline and swollen eyelids. Unlike *Murrell*, however, these specific features were not described to the police in the initial description. On the contrary, Mrs. Brownlow told the police that she did not think she would be able to pick out either of the burglars from photographs and also that she "didn't know if [she] wanted to pick him out at that time."

The state further presented the testimony of Mr. and Mrs. Brownlow and Detective Leroy Dease of the New Haven police department concerning Mrs. Brownlow's pretrial identification of the defendant at an arraignment approximately three weeks after the burglary. From that testimony, the jury reasonably could have

found that on December 17, 1988, Mrs. Brownlow identified the defendant while he was being arraigned on unrelated charges. On that date, Mr. and Mrs. Brownlow were brought to a courtroom by Dease to "see if they could identify" the person who committed the burglary. Approximately fourteen men, at least nine of whom were black, were brought into the courtroom at one time to be arraigned, and Mrs. Brownlow identified the defendant as soon as she saw him come into the room. She testified that the defendant "looked startled to see me" and that he had pointed at her. In addition, she stated that on that day in the courtroom, she was "extremely certain" that the defendant was the person who had been in her bedroom. Finally, although she did not mention the distinctive facial features of the defendant to Dease at the arraignment, she had mentioned them to her husband at that time.

The only corroborating evidence in support of Mrs. Brownlow's in-court and pretrial identifications is Mr. Brownlow's testimony that at the arraignment he saw the defendant point to Mrs. Brownlow, to his eye and then to himself, and that he saw the defendant mouth the words "she saw me" to a young black woman sitting near the door to the courtroom. Nevertheless, Mr. Brownlow did not actually hear the defendant speak these words. Furthermore, although Dease testified that the defendant gestured and said *something* to a young lady sitting near the courtroom door, he had no knowledge of what had been said. There is no physical evidence linking the defendant to the burglary at the Brownlow's residence, such as the radio knobs in *Murrell*. On the contrary, although the police were able to lift six identifiable fingerprints from several areas in the home touched by the intruders, none of the fingerprints were those of the defendant.

Based on the lack of other substantial evidence implicating the defendant in the crime, we cannot say that

the admission of the subsequent crime evidence in this case amounted to harmless error. Rather, it is more probable than not that it influenced the jury to believe that the defendant was predisposed to commit the crimes charged. " ' " 'Any improper evidence that may have a tendency to excite the passions, awaken the sympathy, or influence the judgment, of the jury, cannot be considered as harmless.' " ' *State* v. *Onofrio,* [179 Conn. 23, 32, 425 A.2d 560 (1979)], quoting *State* v. *Loughlin,* 149 Conn. 21, 26, 175 A.2d 367 (1961)." *State* v. *Sierra,* supra, 437. The defendant, therefore, is entitled to a new trial.

Because, the remaining claims of the defendant are likely to be repeated at a retrial of the case, we shall consider them. See *State* v. *Ibraimov,* supra, 355.

## II

The defendant next argues that the trial court improperly denied his motion to suppress the testimony of Allyson Brownlow regarding her pretrial identification of the defendant at his arraignment on unrelated charges. He argues that the procedure used was unnecessarily suggestive and unreliable, and claims a deprivation of his due process rights.

" ' " ' "A defendant who moves to suppress identification evidence bears the initial burden of proving that the identification resulted from an unconstitutional procedure." ' . . . " ' *State* v. *Cubano,* [203 Conn. 81, 93, 523 A.2d 495 (1987)]; *State* v. *Hinton,* [196 Conn. 289, 293, 493 A.2d 836 (1985)]; *State* v. *Fullwood,* 193 Conn. 238, 244, 476 A.2d 550 (1984)." *State* v. *Mayette,* 204 Conn. 571, 581, 529 A.2d 673 (1987). " ' "In determining whether identification procedures violate a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was

unnecessarily suggestive, and second, if it is found to be so, it must be determined whether the identification was nevertheless reliable based on an examination of the 'totality of the circumstances.' " ' *State* v. *Ramsundar*, 204 Conn. 4, 10, 526 A.2d 1311 (1987), quoting *State* v. *Theriault*, 182 Conn. 366, 371–72, 438 A.2d 432 (1980); see also *State* v. *Cubano*, [supra]; *State* v. *Collette*, 199 Conn. 308, 310, 507 A.2d 99 (1986); *State* v. *Hinton*, [supra, 292–93]." *State* v. *Mayette*, supra.

We have considered the suggestiveness of arraignment identifications in *State* v. *Hinton*, supra, and *State* v. *Ledbetter*, 185 Conn. 607, 613, 441 A.2d 595 (1981). In both cases, we recognized that an arraignment identification *may* be suggestive.[10] *State* v. *Hinton*, supra, 295; *State* v. *Ledbetter*, supra. "The mischief involved in the arraignment observation is the real possibility that the victim of one crime, armed with the knowledge that the suspect is being charged with another crime, possibly of the same character, is more likely to leap to the conclusion that the person being arraigned in front of him committed both crimes." *State* v. *Ledbetter*, supra.

Although we recognize the potential for suggestiveness inherent in an arraignment identification, we do not believe that the procedure involved here was unnecessarily suggestive. Mrs. Brownlow testified that Dease informed her and her husband that the police had caught two burglars breaking into a neighborhood residence and requested that they go to the arraignment to try to identify the persons who had been in

---

[10] In *State* v. *Hinton*, 196 Conn. 289, 295, 493 A.2d 836 (1985), we found that although arraignment identifications may be suggestive, under the circumstances of that case, the procedure used was not "so suggestive as to be constitutionally infirm." This determination was based on the fact that the victim had made two positive photographic identifications of the defendant prior to the arraignment. Id. That fact is not present in this case.

their bedroom. The defendant entered the arraignment courtroom with approximately thirteen other men, at least eight of whom were black. At no time did Dease describe the two suspects, give their names, or in any way suggest whom should be picked out. He simply brought the Brownlows into the courtroom, had them sit down, told them that if they recognized the persons who burglarized their house to tell him, and then sat away from them on the other side of the courtroom.

Even if we were to assume that the procedure used was unnecessarily suggestive, the defendant has not met his burden of proving that, under the totality of the circumstances, this identification was so unreliable as to be inadmissible into evidence. See *State* v. *Mayette,* supra; *State* v. *Ramsundar,* supra. " 'In determining whether an identification is reliable in the "totality of the circumstances," the corruptive influence of the suggestive procedure is weighed against "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Manson* v. *Brathwaite,* 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977) . . . .' *State* v. *Cubano,* supra, 95; *State* v. *Collette,* supra, 311 n.3; *State* v. *Hinton,* supra, 295–96." *State* v. *Mayette,* supra, 583.

Under the totality of the circumstances, Mrs. Brownlow's identification of the defendant was reliable. She had ample opportunity to view the defendant during the crime[11] and was paying a high degree of attention

---

[11] At the hearing on the defendant's motion to suppress, Mrs. Brownlow testified that the defendant was in her bedroom for approximately eight to fifteen minutes and that she was observing him the entire time. She further testified that at one point he was less than a foot away from her for

to the defendant during the time he was in her bedroom.[12] A victim of a crime " 'is apt to be a more reliable source of identification than is a mere spectator to the incident.' *Willin* v. *Ajello,* [496 F. Sup. 804, 808 (D. Conn. 1980)]." *In re Juvenile Appeal (83-EF),* 190 Conn. 428, 437, 461 A.2d 957 (1983). Immediately after the burglary, Mrs. Brownlow gave a general description of the defendant to the police. The defendant does not challenge the accuracy of the description, only its lack of specificity. We are concerned, for these purposes, only with accuracy. At the suppression hearing, Mrs. Brownlow testified that she was "very certain" when she made the identification at the arraignment that the defendant was the person who had been in her bedroom.[13] The length of time between the crime and the identification was less than one month. We conclude that the trial court's denial of the defendant's motion to suppress was proper.

## III

The defendant argues that the trial court improperly prohibited him from cross-examining Mrs. Brownlow as to the effect that her examination of photographs

---

approximately one minute, and at other times was between two and eight feet away from her. Although the defendant wore a fiberglass mask covering his mouth and lower nose, she could observe his cheekbones, his forehead and the side of his face. There was a bright overhead light on at all times.

[12] At the suppression hearing, Mrs. Brownlow testified that she was keeping a watch on what was going on because she "didn't just want anything to happen spontaneously and startling." Considering that the defendant was pointing a gun at her, it is a safe assumption that Mrs. Brownlow was paying close attention to the defendant. A further indication of the level of her attention is that, in giving her initial description to the police, she used her two children and their differences in size and build as a reference, and noted that the two men in her bedroom were similar to her two children.

[13] Mrs. Brownlow's professed certainty is supported by the facts that she identified the defendant immediately, as soon as she saw him enter the courtroom, and that the defendant had distinctive features (eyes, hairline and cheekbones) that she recognized.

of the defendant had on her in-court identification of him.[14] He claims that he was denied his constitutional right of confrontation. This constitutional claim was not raised at the trial.

"[A] defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail. The appellate tribunal is free, therefore, to respond to the defendant's claim by focusing on whichever condition is most relevant in the particular circumstances." (Emphasis omitted.) *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989).

We note, however, that although this issue was presented on appeal under *Golding* by way of an unpreserved constitutional claim, we review it only because it is likely to arise on retrial, and we assume

---

[14] Outside the presence of the jury, it was disclosed that the defendant sent to Mrs. Brownlow a letter dated February 21, 1990, accompanied by two color Polaroid photographs of him. Defense counsel sought to cross-examine Mrs. Brownlow as to whether her in-court identification of the defendant was affected by her viewing those photographs, to which the state objected. After balancing the reliability of Mrs. Brownlow's identification, which the court found "extremely reliable" based on the relevant factors, against the manner in which this situation was created, the court sustained the state's objection. The court held: "I think it's fundamental that the Court cannot allow a witness to be placed in an impeachable situation by [the defendant's] own actions post arrest and incarceration . . . . [B]ased on the other factors that have been brought up, which I have indicated strengthen the reliability of the identification, I see very little relevance at all to these photos . . . ."

that the objection will be properly made and preserved at the retrial. A *Golding* analysis is therefore inappropriate. Rather, the traditional analysis of a cross-examination claim is required.

"While ' " '[c]ross-examination is the principal means by which the believability of a witness and the truth [or reliability] of his testimony are tested [;]' *Davis* v. *Alaska,* 415 U.S. 308, 316, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974); *State* v. *Brigandi,* 186 Conn. 521, 533, 442 A.2d 927 (1982) [;]'" ' *State* v. *Milum,* 197 Conn. 602, 608, 500 A.2d 555 (1985); a defendant's right to cross-examination 'is not absolute and is subject to reasonable limitation by the [trial] court.' *State* v. *Thompson,* 191 Conn. 146, 147–48, 463 A.2d 611 (1983); see also *State* v. *Jackson,* 198 Conn. 314, 318–19, 502 A.2d 865 (1986); *State* v. *Vitale,* [197 Conn. 396, 401, 497 A.2d 956 (1985)]. 'The general rule is that restrictions on the scope of cross-examination are within the sound discretion of the trial judge. This discretion comes into play, however, only after the defendant has been permitted cross-examination sufficient to satisfy the sixth amendment. *State* v. *Castro,* 196 Conn. 421, 424, 493 A.2d 223 (1985); *State* v. *Gaynor,* 182 Conn. 501, 508, 435 A.2d 1022 (1980). The constitutional standard is met when defense counsel is permitted to expose to the jury the facts from which the jurors, as the sole triers of the facts and credibility, can appropriately draw inferences relating to the reliability of the witness. *United States* v. *Vasilios,* 598 F.2d 387, 389 (5th Cir.), cert. denied, 444 U.S. 967, 100 S. Ct. 456, 62 L. Ed. 2d 380 (1979), reh. denied, 444 U.S. 1049, 100 S. Ct. 742, 62 L. Ed. 2d 737 (1980), and cert. denied sub nom. *Alexander* v. *United States,* 444 U.S. 932, 100 S. Ct. 277, 62 L. Ed. 2d 190 (1979); *State* v. *Castro,* supra, 425.' *State* v. *Vitale,* supra, 402; see also *State* v. *Weidenhof,* 205 Conn. 262, 270, 533 A.2d 545 (1987);

*State* v. *Milum,* supra, 609; *State* v. *Shindell,* 195 Conn. 128, 140, 486 A.2d 637 (1985); *State* v. *Asherman,* 193 Conn. 695, 718, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985)." *State* v. *Milner,* 206 Conn. 512, 524–25, 539 A.2d 80 (1988); see also *State* v. *Moye,* 214 Conn. 89, 94–95, 570 A.2d 209 (1990).

In applying these principles to the case at hand, we conclude that the trial court did not violate the defendant's right to confrontation by prohibiting him from cross-examining Mrs. Brownlow as to the effect that her examination of photographs of the defendant had on her in-court identification of him.

The defendant cross-examined Mrs. Brownlow at length about her out-of-court identification of the defendant and the statement she gave to the police after the burglary. In particular, the defendant's cross-examination revealed that Mrs. Brownlow had not mentioned the defendant's distinctive facial features to the police and had told the police she did not think she could identify either of the burglars from photographs. The defendant had ample opportunity to impeach the reliability of the witness' identification of the defendant. We are not convinced that this foreclosure of this avenue of questions attempted by the defendant rises to the level of a sixth amendment violation. Rather, the denial of this line of inquiry was within the trial court's discretion. " 'The trial court has broad discretion to determine both the relevancy and remoteness of evidence. . . . Only upon a showing of a clear abuse of discretion will this court set aside on appeal rulings on evidentiary matters.' *Dunham* v. *Dunham,* 204 Conn. 303, 324, 528 A.2d 1123 (1987)." *State* v. *Ireland,* 218 Conn. 447, 452, 590 A.2d 106 (1991).

On the record before us, we cannot say that the trial court abused its discretion by restricting the scope of cross-examination on this subject.

Finally, we note that we read the trial court's ruling prohibiting this line of inquiry as resulting from a balancing of the various factors surrounding the photographs.[15] We are not adopting a prophylactic rule of law that holds that in situations of this nature, the defendant can never question the witness regarding the potential effect that the viewing of the photograph had on the witness. Rather, a balancing of all the factors involved is required by the trial judge, and the final decision rests within the sound discretion of the trial court.

## IV

The defendant claims that the trial court improperly excluded the testimony of Michelle Gary, the defendant's girlfriend, as to certain incriminating statements made to her by the defendant's brother, Donald Payne.

At a lengthy offer of proof outside the presence of the jury, the court heard testimony from Gary, Donald Payne and the defendant. The defendant sought to have Gary testify that: in November and December, 1988, Donald Payne had been committing burglaries on Prospect Street; late one night Donald Payne came to the defendant and Gary's house and invited the defendant to commit a burglary with him, but the defendant declined; the next morning, Donald Payne came to their house again and bragged about the burglary he had just committed with another person, where they had awakened people in their bedroom and robbed them; on that same morning, Donald Payne tried to get Gary to purchase a diamond ring that he had in his possession; several weeks later, after the defendant had been

---

[15] Out of the presence of the jury, the court questioned Mrs. Brownlow, whose veracity was not impeached, about whether she had based her identification of the defendant on those photographs. Mrs. Brownlow replied, "It has nothing to do with that picture. In fact, I thought the picture was a trick because the color photograph makes him so much lighter."

arrested, Gary was riding in a car with Donald Payne when he pointed out a house on Prospect Street and said, "that is the house . . . that Freddie is being blamed in jail for right now," and then he bragged about how he had committed that burglary.

"At the outset, we note that '[t]he determination [of] whether a third party declaration against penal interest is trustworthy lies in the sound discretion of the trial court. *State* v. *DeFreitas,* [179 Conn. 431, 452, 426 A.2d 799 (1980)].' [*State* v. *Bryant,* 202 Conn. 676, 693, 513 A.2d 66 (1987)]. Evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice. See *State* v. *Martin,* 170 Conn. 161, 166, 364 A.2d 104 (1976)." *State* v. *Hernandez,* 204 Conn. 377, 390, 528 A.2d 794 (1987).

" 'In *State* v. *DeFreitas,* [supra, 450–51], we adopted a rule, consistent with *Chambers* v. *Mississippi,* [410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)], and in accord with rule 804 (b) (3) of the Federal Rules of Evidence, which provides that trustworthy third party statements against penal interest which are exculpatory to the defendant, are admissible if the declarant is unavailable.' *State* v. *Bryant,* 202 Conn. 676, 692, 523 A.2d 451 (1987); see also *State* v. *Frye,* 182 Conn. 476, 479, 438 A.2d 735 (1980); *State* v. *Gold,* 180 Conn. 619, 630, 430 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980)." *State* v. *Mayette,* supra, 576.

"In determining the trustworthiness of a third party declaration against penal interest, this court has set forth four general considerations: (1) the time the declaration is made and the party to whom it is made; (2) the existence of corroborating evidence; (3) the extent to which the statement is really against the declarant's

penal interest; and (4) the availability of the declarant as a witness. *State* v. *Bryant,* supra, 693, and cases cited therein; *State* v. *Gold,* supra, 633; *State* v. *DeFreitas,* supra, 451." Id., 577.

It is uncontested that Donald Payne was unavailable as a witness because he invoked his fifth amendment right against self-incrimination. See id., citing *State* v. *DeFreitas,* supra, 441. Additionally, it is undisputed that Donald Payne's statements, as reported by Gary, were against his penal interest. Thus, our examination is limited to the time of the declarations and the party to whom they were made, and the evidence corroborating the statements.

As to the first element, the trial court found that the long-standing relationship between the defendant and Gary would not lead to a conclusion of trustworthiness.[16] The trial court analogized this case to the situation in *State* v. *Sanchez,* 200 Conn. 721, 726, 513 A.2d 653 (1986), where we found that the witness' intimate relationship with the defendant was a factor "coloring" the trustworthiness of the proffered statements. We agree with the trial court's conclusion.

As to the second element, the trial court found that there was no evidence corroborating these statements. Since Donald Payne refused to answer any questions directly related to this incident, his testimony provided no corroboration and the defendant's testimony during the offer of proof in fact contradicted Gary's testimony as to the content of the conversations between Donald Payne and the defendant.[17]

---

[16] During the offer of proof, Gary testified that as of December, 1988, she had been living with the defendant for over one year and was in love with him.

[17] In particular, the defendant testified that Donald Payne did not admit that he committed this burglary and that the ring Donald offered to sell to Gary was one he had purchased for his fiancee.

Given the lack of corroborating evidence, the nature of the relationship between Gary and the defendant, and the defendant's own testimony contradicting that of Gary regarding Donald Payne's purported statement, we conclude that the trial court did not abuse its discretion in prohibiting Gary's testimony.

## V

The defendant's final claim on appeal is that the trial court improperly prohibited him from: (1) presenting evidence that his brother, Donald Payne, committed this crime; and (2) calling Donald Payne as a witness so that the jury could observe the physical similarities between the defendant and his brother. The gravamen of this third party culpability defense was the testimony of Gary, discussed in part IV, supra, concerning Donald Payne's declarations against penal interest, and evidence that Donald Payne committed a burglary similar to this one six months after it.[18]

As discussed in part IV, supra, the testimony of Gary concerning Donald Payne's declarations against penal interest was properly excluded.

"We have considered on several occasions the admissibility of evidence offered to inculpate a person other than the accused in the commission of the crime. See, e.g., *State* v. *Milner*, 206 Conn. 512, 517, 539 A.2d 80 (1988); *State* v. *Echols*, 203 Conn. 385, 392–93, 524 A.2d 1143 (1987); *State* v. *Burge*, 195 Conn. 232, 252, 487 A.2d 532 (1985); *Siemon* v. *Stoughton*, 184 Conn. 547, 555, 440 A.2d 210 (1981); *State* v. *Giguere*, 184 Conn. 400, 405, 439 A.2d 1040 (1981); *State* v. *Gold*, [supra,

---

[18] The defendant did testify before the jury that he was home on the night of this burglary; that he was visited by his brother Donald and Donald's friend late that night; that Donald and his friend returned early the next morning; and that Donald then had in his possession a gold ring with a clear stone in it. This testimony was admitted for the purpose of establishing an alibi.

645–46]; *State* v. *Kinsey,* 173 Conn. 344, 347–48, 377 A.2d 1095 (1977). ' "Ordinarily, evidence concerning a third party's involvement is not admissible until there is some evidence which *directly connects* that third party with the crime." (Emphasis added.) *State* v. *Kinsey,* [supra, 348]. "The defendant can always show that some other person and not the defendant committed the crime; however, it is within the sound discretion of the trial court to refuse to admit such evidence when it simply affords a possible ground of possible suspicion against another person." ' *State* v. *Giguere,* supra, 405; see also *State* v. *John,* 210 Conn. 652, 670, 557 A.2d 93 (1989)." *State* v. *Delossantos,* 211 Conn. 258, 270, 559 A.2d 164, cert. denied, 493 U.S. 866, 110 S. Ct. 188, 107 L. Ed. 2d 142 (1989). The trial court's ruling on the relevancy of third party inculpatory evidence will be reversed on appeal only if the court has abused its discretion or an injustice appears to have been done. Id., 271.

The trial court found that there was no reliable evidence directly linking Donald Payne to this crime and, therefore, the proffered evidence of Donald Payne's commission of a similar crime was inadmissible. We agree.

Further, because of this lack of a direct link to this crime, the trial court ruled that the defendant could not call Donald Payne as a witness to answer non-privileged questions in order to permit the jury to observe the physical similarities between him and the defendant. In *State* v. *Bryant,* supra, 687, we reiterated that the defendant may not call a third party who the defendant maintains committed the crime simply to have him invoke his fifth amendment privilege in front of the jury. The defendant may, however, call the third party to testify as to those questions that he had willingly answered at the voir dire, so long as that testimony is relevant. Id. At the voir dire, Donald Payne testified that in November and December, 1988, he

lived one street over from his brother, the defendant; that he saw a lot of his brother during that time; that he lived with Claudia Payne at this time; that he knew of his brother's arrests and incarceration at the Whalley Avenue jail; that he did not visit his brother at that jail; that his brother was living with Gary during this time; and that he knew Russell Brantley, the person whom Gary claimed to have committed this crime with Donald Payne. None of Donald Payne's testimony directly linked him to this crime. As such, the trial court's decision to prohibit Donald Payne's testimony as irrelevant was not an abuse of discretion. Without a direct link to the crime charged, the parading of look-alikes in front of the jury would "simply afford a possible ground of possible suspicion against another person" and would be improper. See *State* v. *Delossantos, supra*, and cases cited therein.

The judgment of the trial court is reversed and the case is remanded for a new trial.

In this opinion PETERS, C. J., and BORDEN, J., concurred.

COVELLO, J., with whom HULL, J., joins, dissenting. I do not believe that the defendant has shown that it is more probable than not that the introduction of the "subsequent crimes" testimony influenced the trial's outcome. I would therefore not order a new trial.

" 'When a trial error in a criminal case does not involve a constitutional violation the burden is on the defendant to demonstrate the harmfulness of the court's error. *State* v. *Ruth,* 181 Conn. 187, 196–97, 435 A.2d 3 (1980). The defendant must show that it is more probable than not that the erroneous action of the court affected the result. Id.; *State* v. *McClain,* 171 Conn. 293, 300, 370 A.2d 928 (1976).' *State* v. *Jones,* 205 Conn. 723, 732, 535 A.2d 808 (1988)." *State* v.

*Vilalastra,* 207 Conn. 35, 47, 540 A.2d 42 (1988). Thus, in the context of this case, with the overwhelming evidence of the defendant's identity, the defendant must demonstrate, therefore, that the introduction of the "subsequent crimes" testimony, despite the court's careful limiting instruction, improperly influenced the verdict.

The majority overlooks the cumulative effect of: (1) the terrifyingly specific circumstances under which Mrs. Brownlow had an opportunity to form a specific and lasting impression of the defendant; (2) the positive and certain manner in which she thereafter recalled him; (3) the defendant's own reaction when he again observed Mrs. Brownlow; and (4) the trial court's very specific limiting instructions concerning the "subsequent crimes" evidence.

The jury learned that as the Brownlows lay asleep, at approximately 6 a.m., they were awakened when their bedroom door burst open, *the lights were turned on* and two black men with guns entered the room. *The lights in the bedroom were very bright.* The first man who entered proceeded to James Brownlow's side of the bed and held a handgun to his head. The second man, identified as the defendant, followed the first man into the room and pointed his handgun at Mrs. Brownlow's head. The man identified as the defendant, wore a fiberglass painter's mask that covered the lower part of his nose and mouth. While pointing his weapon at Mrs. Brownlow, the defendant rifled through the dresser drawers on her side of the bed. When the defendant's partner became agitated at the apparent lack of valuable goods, Mrs. Brownlow sat up, took off her engagement ring, and gave it to the defendant. When she gave her ring to him, she got a very good look at his face. She then laid on her side and continued to watch the defendant who was, for the most part, *no more than two or three feet from her throughout the entire fifteen minutes the incident lasted.*

Although initially uncertain of her ability to identify either burglar, Mrs. Brownlow described the defendant as "a dark-complexioned black male with short hair, approximately 5'10" or 11" tall, with a muscular build. He was wearing a sweatshirt under a medium length dark gray or black coat. She later stated that the defendant's facial features (his prominent widow's peak and his swollen eyes), were very distinctive and told the jury that she was "extremely certain" as to his identification. When asked to identify the defendant in a lineup of others, Mrs. Brownlow was "very certain" as to her identification and made it while the defendant was being brought into the courtroom with the other prisoners. It was at this time that the defendant appeared to tell someone nearby, "She saw me."

Further, in connection with the other crimes evidence, the trial court specifically charged the jury: "[I]f you do not believe [the evidence offered of a separate crime] or even if you do, if you find that it does not logically, rationally, and conclusively support the issues or the element for which it is being offered by the State, namely identity, then you may not consider that testimony for any purpose. The danger of receiving evidence of prior misconduct, even for the limited purpose of attempting to prove identity, is that it may predispose your mind uncritically to believe the defendant may be guilty of the offense here charged merely because of the alleged prior misconduct."

"The jury is presumed, in the absence of an indication to the contrary, to have followed the instructions of the trial court." *State* v. *Moye,* 199 Conn. 389, 396, 507 A.2d 1001 (1986). If the evidence of the separate crime was not " 'sufficiently distinctive to support a reasonable belief that the same person committed both'[;] *State* v. *Ibraimov,* [187 Conn. 348, 354, 446 A.2d 382 (1982)]"; *State* v. *Braman,* 191 Conn. 670, 681, 469

A.2d 760 (1983); it must be presumed that the jury followed the trial court's instructions and concluded that the evidence did not "logically, rationally and conclusively" support the issue of identification and therefore, could "not [be] consider[ed] . . . for any purpose."

Accordingly, I dissent.