[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE PREJUDGMENT REMEDY
Plaintiff brings this action for breach of contract and unjust enrichment and now seeks a prejudgment remedy.
Facts
The Plaintiff operates a real estate investment and CT Page 1047 consulting business. In the early 1990's he was employed by Bank of Boston Connecticut (Boston) as a vice President and team leader and he supervised the management and disposition of properties acquired by Boston by foreclosure or through workout negotiations. The Plaintiff worked closely with the problem loan workout unit at Boston during his tenure there.
Boston is a wholly-owned subsidiary of First National Bank of Boston (Bank). While employed at Boston the Plaintiff reported on a regular basis to his superiors at Bank, and was required to travel to Boston on a regular basis to make committee presentations. While working at Boston, the Plaintiff became familiar with the policies and practices of that institution, as well as the policies and practices of Bank, with respect to the handling of problem real estate loans. He also became acquainted with bank personnel handling problem loans at both Boston and Bank.
Prior to working at Boston the Plaintiff was an officer with Aetna Realty Investors. In that position he managed a portfolio of problem loans.
The Defendant is a corporation which owns certain real estate located at 699 Middle Street in Middletown, Connecticut (the "Property").
The Defendant (and/or its predecessors) had a lending relationship with Bank which dated back to 1988. In 1994, the Defendant engaged in workout negotiations with the Bank which resulted in a restructuring of its debt.
Paul v. Allegretto (Allegretto) is the President of Defendant.
In December of 1994, the Plaintiff was introduced to Mr. Allegretto, and other representatives of the Defendant and engaged in meetings with them. The parties focused on the Plaintiff purchasing an interest in the Property but they could not reach an agreement with respect to that and began to discuss loan with the Bank. As of December, 1994, the Defendant's loan with the Bank. As of December, 1994, the Defendant remained engaged in workout negotiations with the Bank.
As of January 1, 1995, the principal amount of the debt CT Page 1048 owed by the Defendant to the Bank was approximately $3.3 million. This debt was secured by a mortgage on the Property.
Neither Mr. Allegretto nor his business partner, Mr. Grigoriou, had any substantial experience handling troubled real estate loans. Mr. Allegretto believed that the Plaintiff's background in handling troubled real estate loans, together with his connections at the Bank, made him a suitable candidate to assist the Defendant in its negotiations with the Bank. Mr. Allegretto also had a good working relationship with the Bank's representative, Howard Bailey, which he wanted to preserve. Mr. Allegretto believed that the Plaintiff could act as a buffer between the Defendant and the Bank in workout negotiations.
By a letter agreement dated January 23, 1995 (the "Contract"), the Defendant retained the Plaintiff to assist in its workout negotiations with the Bank. Pursuant to the terms of the Contract, the Plaintiff was to perform the following services "I will negotiate with [the Bank], on your behalf, to obtain the agreement of [the Bank] to accept a lump sum payment, in full satisfaction of their mortgage (which presently has a principal balance of approximately $3,300,000.00.") Paragraph 2 of the Contract provides a formula, containing both fixed and contingent components, for calculating the fee to be paid the Plaintiff for his services. Paragraph 3 of the agreement provides that once the written agreement of the Bank to accept a reduced lump sum payment in full satisfaction of the Loan is secured, the Defendant must use its best efforts to obtain new financing to make this reduced lump sum payment. Paragraph 4 of the agreement provides that the Plaintiff's fee shall be paid in full at the closing of the new financing.
There is nothing in the Contract in regard to title to the Property, encumbrances upon it, or environmental problems.
Between January, 1995 and May, 1995, the Plaintiff negotiated with the Bank on behalf of the Defendant to obtain the Bank's agreement to accept a lump sum payment in full satisfaction of the Defendant's mortgage debt. He met with representatives of the Defendant to discuss a strategy for pursuing his negotiations with the Bank. Plaintiff communicated directly with the Bank's representative, Mr. Bailey, in an effort to negotiate a reduction in the mortgage CT Page 1049 debt. Those discussions with Mr. Bailey were authorized by the Defendant. Plaintiff reported to representatives of the Defendant on the status of these discussions.
In order to discuss the present value of the debt Plaintiff gathered information about the environmental condition of the Property from the Defendant's environmental consultant, GZA GeoEnvironmental, Inc. ("GZA"), and counselled the Defendant on how best to present a report on the environmental condition of the Property to the Bank. Working with the Plaintiff, GZA prepared a report, dated February 9, 1995, which outlined the environmental problems at the Property and supplied estimated remediation costs. Soon thereafter, the Plaintiff forwarded a copy of GZA's February 9, 1995 report to the Bank.
The Plaintiff also gathered information concerning unpaid real estate taxes due with respect to the Property, together with an estimate of the cost to bring the building and Property to a marketable condition for tenants. Plaintiff also obtained information concerning the value of the Property based upon comparable sales.
In early May, 1995, the Plaintiff and Mr. Allegretto discussed making a written settlement proposal to the Bank. They decided that a lump sum settlement proposal of $500,000.00 would be appropriate, and the Plaintiff was given the job of preparing that written proposal. To support the Defendant's settlement proposal to the Bank, the Plaintiff sent to Mr. Bailey certain information supporting a low valuation for the Property. He followed this with the written settlement proposal he had prepared.
The Bank then requested a meeting in Middletown to view the Property and discuss the settlement in late May, 1995. It was attended by Mr. Allegretto, the Plaintiff, Mr. Bailey and another representative of the Bank. The Defendant's proposal to pay a lump sum of $500,000.00 in full satisfaction of its outstanding mortgage debt was discussed at that meeting, and the Plaintiff participated in those discussions. Two days later, Mr. Bailey called Mr. Allegretto and advised him that, subject to committee approval, the Bank would be willing to accept a lump sum payment of $750,000.00 in full satisfaction of the Defendant's mortgage debt. Mr. Allegretto agreed to this proposal and thereafter told the Plaintiff of the CT Page 1050 agreement.
On the same day, the Defendant reached an agreement with Shawmut Capital Corporation ("Shawmut Capital"), pursuant to which Shawmut Capital would provide financing for the settlement with the Bank. Shawmut Capital agreed to lend $1.5 million to E. W. Bliss Company, a company related to the Defendant by common ownership and management. E. W. Bliss Company, in turn, agreed to lend these funds to the Defendant. The loan from E. W. Bliss Company to the Defendant was to be secured by a mortgage on the Property.
On June 6, 1995, the Bank's lawyers faxed a proposed settlement agreement to the Defendant, the Defendant's lawyer, and the Plaintiff. A closing was held on June 27, 1995, and the Defendant received, through E. W. Bliss Company, $1.5 million in loan proceeds from Shawmut Capital, $750,000.00 of which was paid to the Bank in full satisfaction of the Defendant's mortgage debt. The balance of the loan proceeds, another $750,000.00, was retained by the Defendant to pay other obligations and operating expenses.
The Defendant paid nothing to the Plaintiff at the time of the closing for services rendered by the Plaintiff at the time of the closing for services rendered by the Plaintiff under the Contract.
Upon execution of the settlement agreement by the parties and payment of the settlement proceeds, the Bank provided the Defendant with an executed discharge dated June 29, 1995 (a Thursday) acknowledging satisfaction of the mortgage debt. That discharge was recorded two weeks later in the office of the Middletown town clerk on July 11, 1995.
Allegretto admitted that the Plaintiff lived up to his commitment under the terms of the Contract to obtain the Bank's agreement to accept a lump sum payment in full satisfaction of the mortgage debt. He had no complaints about the Plaintiff's performance under the Contract. Allegretto stated that when the Plaintiff submitted a statement reflecting the fee earned for services rendered under the Contract, he believed that the Plaintiff was entitled to such a fee, and considered the Plaintiff's fee statement to be a bill that had to be paid by the Defendant. In discussions between the Plaintiff and Mr. Allegretto through the end of CT Page 1051 June, 1995, Mr. Allegretto never denied that the Plaintiff was entitled to a fee under the terms of the Contract and never contested the Plaintiff's calculation of this fee.
The Contract was to obtain discharge of the debt for a lesser amount. That was the intent of the parties. It was not to obtain a release of the mortgage securing the debt.
The court does not find that Contract ambiguous.
Plaintiff has fulfilled his obligation under the Contract.
The court finds no fraud or misrepresentation by plaintiff.
Law
This court must and has considered the entire contract.Barnard v. Barnard, 219 Conn. 99, 109.
I. C.G.S. § 20-325a(b)
Defendant claims that plaintiff was acting as a real estate broker under C.G.S. § 20-325 (b) because he was obtaining "a fee simple interest in land" for defendants and under the statute plaintiff must have a contract which complies with that statute.
It is true the Contract did not comply with the statute but he was not acting under the statute.
"While in our law a mortgage in form and legal theory is a conveyance of a fee and the mortgagee acquires a right of possession under it, yet his estate is, except for a limited purpose, regarded as personal property and the mortgage merely security for the debt; [citations omitted] it is true here as elsewhere that whatever extinguishes the debt discharges the mortgage." Glotzer v. Keyes, 125 Conn. 227, 232. In fact in Connecticut, "all mortgages should be looked on as part of the personal estate" and not real property. Roath v. Smith,5 Conn. 133, 135.
Payment of the mortgage debt by payment of the note satisfies the mortgage and discharges it. Thereafter the CT Page 1052 mortgagee must give a release upon a simple request. C.G.S. § 49-8.
The mortgagor Defendant has "as against everyone but the mortgagee [Bank the] equivalent to a fee simple interest."Ensign v. Batterson, et Ux., 68 Conn. 298, 305.
"Now the law is well settled that except as between the immediate parties, the mortgagor before foreclosure is owner of the property . . . while the interest of the mortgagee is mere personal estate." Waterbury Savings Bank v. Lawler,46 Conn. 243, 245, Peck v. Lee, 110 Conn., 374, 378.
Plaintiff was not involved in obtaining a fee interest in land and his actions were not controlled by the statute.
The court finds probable cause that plaintiff shall prevail on the Contract claim in the amount of $602.500.
N. O'Neill, J.